I. A. WATSON, Jr., et al., Plaintiffs-Appellants,

v.

CITY OF MEMPHIS, TENNESSEE, et al., Defendants-Appellees.

No. 14662.

United States Court of Appeals
Sixth Circuit.
June 12, 1962.

Derrick A. Bell, Jr., New York City, A. W. Willis, Jr., Memphis, Tenn., Constance Baker Motley, Thurgood Marshall, New York City, on brief; Elwood H. Chisolm, New York City, B. L. Hooks, C. O. Horton, B. F. Jones, H. T. Lockard, R. B. Sugarmon, Jr., Memphis, Tenn., of counsel, for plaintiffs-appellants.

Thomas R. Prewitt and Frank B. Gianotti, Jr., Memphis, Tenn., J. S. Allen—Walter Chandler, Memphis, Tenn., on brief, for defendants-appellees.

Before McALLISTER and O'SULLIVAN, Circuit Judges, and STARR, Senior District Judge.

McALLISTER, Circuit Judge.

This is an appeal from a judgment of the district court denying a permanent injunction restraining the Memphis Park Commission and others from operating and maintaining certain public recreational facilities on a racially-segregated basis; approving a plan proposed by appellees for a gradual desegregation of certain of these facilities; and ordering the Memphis Park Commission to file, within a six-months' period, a further plan for the desegregation of all recreational facilities of the City.

In the complaint filed in this class action on behalf of appellants and others, it was alleged that the City of Memphis had denied certain of the appellants access to the Pine Hill Golf Course, the McKellar Lake Boat Dock, the Brooks Art Gallery, the John Rogers Tennis Court, and the Pink Palace Museum, solely because of the fact that they were Negroes. Prior to the hearing of this case in the district court, the City of Memphis had already desegregated the McKellar Lake Boat Dock and the Brooks

Art Gallery; and the Pine Hill Golf Course had been desegregated prior to the time of the argument of this appeal. At the time of the hearing in the district court, the City of Memphis was undecided whether it would sell the John Rogers Tennis Court, because it was such valuable property. However, it has since been desegregated. As to the Pink Palace Museum, it was given to the City on the condition that it should be used only by white people, with a provision of reverter in the deed, in case of violation of this condition; and the district court ordered the City, within ninety days, to file suit in the courts of Tennessee for a declaratory judgment in order to secure a full adjudication of all matters that might affect the use, and reversion, and to determine what effect integration of the races at the Museum would have upon the title of the City of Memphis to the property.

It may be generally said, then, that the complaint of appellants as to the refusal of the City to permit them to use the parks specified in their allegation on the ground of racial discrimination has been remedied by the City through its action in desegregating the recreational facilities in question. However, appellants rest their claim on the other allegation of their complaint to the effect that the City of Memphis is violating their constitutional rights in maintaining and operating all of its other parks, playgrounds, and recreational facilities upon a racially-segregated basis. It was in regard to these facilities that the district court issued an order requiring the City to submit, within a six-months' period, a plan for the total desegregation of all of its recreational facilities.

Appellants' contention is that the law permits of no delays on the part of the City of Memphis in effecting the desegregation of all its parks and recreational facilities, and that the district court was in error in not ordering all of the parks and recreational facilities of the City of Memphis to be immediately desegregated. Specifically, appellants claim that the district court committed

reversible error "in holding that the decision in Brown v. Board of Education, 349 U.S. 294 [75 S.Ct. 753, 99 L.Ed. 1083], which contemplates allowing a delay in the desegregation of public elementary and secondary schools, where certain conditions exist, is applicable in any action involving public recreational facilities." As contended by appellants, "logic as well as law requires limiting approval of delay to litigation involving public elementary and secondary schools, for attendance in such schools is compulsory almost everywhere whereas no one is compelled to utilize public recreational facilities."

The background of the case is as follows: The City of Memphis has a population of approximately 500,000 people, of whom 63% are white, and 37% are Negro. Approximately 100,000 children participate in one or more of the recreational activities sponsored by the Memphis Park Commission and carried on through its Recreational Department. This is a remarkable civic achievement on the part of the City of Memphis and its citizens. Of the 100,000 children participating, approximately 65,000 are white, and 35,000 are Negro. The Department sponsors many and varied types of recreational activities, including, but not limited to, competitive sports, such as baseball and basketball, as well as dancing and similar activities. The Recreational Department headquarters is itself operated on an integrated basis. All Negro Supervisors and Directors are paid on the same salary schedule as the white Supervisors and Directors; and the qualifications of white and Negro Supervisors and Directors are the same. The Recreational Department of the Memphis Park Commission is rated by competent authorities as the best in the South; and its recreational program for Negroes as the finest in the country.

Upon the trial, it appeared that the City of Memphis, through its Park Commission, operates and maintains 131 parks and facilities, of which 108 are developed, and 23 are undeveloped, or "raw" land, that 25 of the developed facilities are restricted to Negroes; 25 are open to both races; and 58 are restricted to white persons; that the facilities operated on a racially-segregated basis include 40 neighborhood playgrounds for white persons, and 21 for Negroes; 8 white, and 4 Negro community centers; 5 white, and 5 Negro swimming pools; 5 white, and 2 Negro golf courses; and 2 "city-wide" white stadiums. It appears that, over the years of the past, it has been the policy of the Park Commission to designate parks and playgrounds as white or Negro, according to the racial character of the neighborhood. Pursuant to this policy, at the time of the trial, the district court found that 6 facilities would be changed from white to Negro use in the near future and that, as a result, the ratio for community centers would be changed from 8 white and 4 Negro centers to, 1 integrated, 7 white, and 4 Negro centers; and for swimming pools, the ratio would be changed from 5 white, and 5 Negro swimming pools, to 4 white, and 6 Negro swimming pools. It appeared on the trial that the Park Commission had recently removed all racial restrictions at 3 "city-wide" facilities, namely: Overton Park Zoo, the Art Gallery in Overton Park, and the McKellar Lake Boat Dock. In June, 1961, the Park Commission's plan, which was approved by the court in the instant case, proposed to desegregate Fairgrounds Amusement Park at the end of 1961. This park, at the time of the hearing of this appeal, had already been desegregated. The Park Commission's plan also proposed, beginning in January 1962, to desegregate all 7 public golf courses on a three-year schedule. Four golf courses had already been desegregated at the time of the hearing of this appeal.

From the testimony of the Director of Parks of the City of Memphis, it appeared that, as each park and facility was desegregated, more recreational directors and supervisors were necessary and were appointed, and more policemen were required to patrol the parks and playgrounds. As an instance, the opening

of the zoo on a desegregated basis made it necessary to increase the police protection there. The Director of Parks further testified that if there were immediate desegregation of all parks and playgrounds, the City would be obliged to reduce the number of available playgrounds in order to give the children full protection, and that such action would result in a denial of recreational facilities to a great number of children, both white and Negro. The Director also testified that one of the chief purposes of the recreational program was to cut down on juvenile delinquency of all children; and that one of the objectives, in this regard, was to keep as many children as possible "off the streets," during the summer vacation period. This objective would obviously be frustrated if numerous playgrounds were closed.

The Superintendent of the Recreational Department of the Memphis Park Commission, with thirty-six years of experience in the field of public recreation, testified that if there were immediate and total integration of parks and playgrounds of Memphis, "many, many of the playgrounds would have to be closed down"; more supervisors would be needed; there would be much additional violence and confusion; and, in his opinion, the playground system would be ruined. He had previously studied the matter of desegregation of golf courses in a number of southern cities, including Atlanta, Nashville, Dallas, and New Orleans, where he had learned that there had been some trouble during the integration progress but no bloodshed or violence. However, he did state that with regard to the playgrounds in Memphis, they had been obliged, on occasion, to call the police because of rowdies and trouble-makers, at the Negro parks, as well as at the white parks.

In explaining what he meant by "confusion," the Superintendent alluded to an experience which they had in Memphis where, because of the large numbers congregating for certain events, at "one of the closing exercises for Negroes at Lincoln Park, we had bloodshed, and shootings, and knifings, and it became necessary to break that down into separate closing exercises because of the trouble we had." This was an instance of what the Superintendent called "confusion" resulting from exercises participated in by great numbers of people at parks and playgrounds; and this "confusion" had nothing to do with desegregation, since all of those taking part in the exercises were Negroes. The difficulty obviously arose from a congregation of toughs, juvenile delinquents, and criminal elements, who, out of all proportion to their numbers, can cause trouble, violence, fighting, and bloodshed, among a great crowd of innocent people.

James C. Macdonald, Chief of Police of the City of Memphis, who had been with the Police Department twenty-one years, stated that he had given several years of thought and consideration, since the decision in the Brown case, to the problems of desegregation in Memphis, from the standpoint on the preservation of law and order; that when trouble resulted from "sit ins" and desegregated seating in busses, the Police Department, as soon as it received a call, would send three or four police cars "to get there as quickly as possible to keep down any violence." He further stated that he had been consulted by the Park Commission, that he thought its plan was good, and that since the Brown case was decided in 1954, a number of facilities in Memphis had been opened on a non-segregated basis, including libraries, the zoo, and other facilities. In the opinion of the Chief, the key to the solution of the problem was the timing—"where it would be on a gradual basis where the hot heads wouldn't have a chance to act. * * * We will have a little idea of what is coming off and can lay our groundwork for it and hope to be able to handle the situation."

Chief Macdonald put it succinctly: "You have a few in any bunch that will agitate trouble. I have seen it a lot of times that a few will cause a lot of people to get in trouble." He stated that he thought they had been very fortunate

with so-called agitators in Memphis as compared to other communities, and that they did not have the agitation in Memphis that there had been in other places. In his opinion, the police could not handle the situation if all the park facilities were integrated at one time.

Mr. Harry Pierotti, Chairman of the Memphis Park Commission, stated that the City of Memphis had been singularly blessed by the absence of turmoil on the race question up to the date of the hearing of this case, and that he felt it was one of the Park Commission's duties to all the people of Memphis, white and Negro, to keep it that way. He stated: "I am going to abide by the rules of this court or get off the Park Commission, because I want no instance here like they have had in other parts of the South. And I believe that we can live better as a people if you permit us to desegregate these things on a gradual basis. * * * Not only have I, but the other members of the Commission have, given this a long, hard look, and a lot of serious thought. This plan which we are evolving, and which we are asking the court to approve is not one which was gotten up overnight. It was the result of a good many conferences with the members of my Commission and with other people. * * * Among other people, we have conferred with the law-enforcing officials and have gotten their opinion in the matter." He further stated that, upon integrating any facility, it, of course, involves additional personnel to make the transition period a smooth one, and that the consideration of avoiding confusion and turmoil in the community was a very strong factor in their determination as to when and what facilities should be integrated. In addition to the avoidance of confusion and violence, the city officials also took into consideration the effect of immediate or gradual desegregation upon the question of revenue from concessions operated by others for the Commission, and by the Commission itself.

The concessions, for certain amusement devices, operated by individuals, are granted by the Commission for rentals based upon gross receipts. The Commission felt that if it were to desegregate the Fairgrounds Amusement Park in the middle of the year, it would be unfair to such concessionaires and detrimental to the Commission. This amusement park was, however, to be desegregated six months after the hearing in the district court, or on January 1, 1962, and it has been desegregated since that date. The income from concessions, or similar operations, aggregated three quarters of a million dollars a year, or a third of the budget, and the Park Commission is obliged to earn this amount in order to operate the various facilities. If a large number of the facilities were closed down, the operating income would be seriously curtailed. Mr. Pierotti stated that one of the reasons for his favoring the plan of a more gradual desegregation, rather than immediate integration of all the parks and recreational facilities, was what he stated to be the rather peculiar situation and location of Memphis,—a city of a half a million people, with more than one-third of its population consisting of Negro citizens; with the State of Arkansas just across the river from Memphis; and the State of Mississippi, five miles south of the city limits of Memphis; where such surrounding area was predominately Negro; and where those people from this surrounding area made use of the recreational facilities. He felt that since the taxes used to maintain these parks and recreational facilities were paid by the citizens of Memphis, the predominance of a colored population, composed not only of Negro citizens in Memphis, but including many in the adjoining areas of Mississippi and Arkansas, who used the parks, would "promote" violence on the part of both Negroes and whites, in case of immediate desegregation of all of the parks, playgrounds and recreational facilities of the City of Memphis; and he based his opinion on his consultations with the park officials, the police officers, and his knowledge of the City and its people.

None of the evidence introduced on behalf of the City of Memphis is questioned. Whether the system of organized play in which these thousands of children take part, may be greatly curtailed or put in jeopardy by immediate desegregation of all the parks and playgrounds, is deemed irrelevant by appellants. The probable closing down of many of these facilities is considered equally irrelevant by appellants, as are any questions of orderly transition, police protection, maintenance of the present friendly and peaceful relations between all of the white and colored citizens of Memphis.

The evidence before us shows that what the City of Memphis proposes is not a mere promise to do something, sometime in a remote or uncertain future. On the trial it submitted a plan for the desegregation for a number of the parks and recreational facilities of the City, of which a substantial part had already been carried out after the plan was prepared, and before the hearing in the district court. It was further shown that the City had also desegregated a further substantial number of recreational facilities, subsequent to the hearing in the district court, and before the arguments in this court on the present appeal; and, from the statements made during arguments on appeal by counsel for the City as to the plan and intention of the City, which apparently were not doubted by counsel for appellants, it would appear that a substantial part of a specified program of desegregation has been carried out since the arguments on appeal. We therefore have before us a program of desegregation that has been carried out, is being carried out at the present time, and will be carried out in the future until all of the City's parks, playgrounds, and recreational facilities are desegregated.

The plan for the desegregation of all of the City's recreational facilities, which the district court ordered to be filed within a six-months' period after the hearing, is not, of course, in the record before us, nor has the district court had, as yet, the opportunity of approving it as a proper plan to effect the desegregation, with all deliberate speed, of all the parks, playgrounds, and recreational facilities of the City of Memphis. This plan, which, it appears, has been formulated, but which has not yet been filed with the district court, because of this intervening appeal, is not before us, therefore, for consideration.

The plan of the Memphis Park Commission, which was before the district court for integration of certain recreational facilities, provided for the desegregation of the Fairgrounds Amusement Park by the end of 1961; for the desegregation of three golf courses by March 1, 1962; for the desegregation of three more golf courses (one, used at present exclusively by Negroes) before March 1, 1963; and for the desegregation of the last of the seven municipal golf courses at the end of 1963. Moreover, in the plan, the Memphis Park Commission stated that it proposed to accelerate this program where judged practicable.

The foregoing was the plan which the district court approved; the court also directed that the City should file a further plan for the integration of all of the parks, playgrounds, and recreational facilities within a period of six months from the date of its judgment; and the court expressly retained jurisdiction of the case for such further proceedings as might be necessary from time to time.

Appellants made no specified objections to the plan which the district court approved. As the court stated in its opinion:

"No valid objection to this plan in the Court's opinion is offered in this case. The plaintiffs merely say they want all of these facilities fully integrated now. Nothing else seems to matter."

This court is not in a position, at the present time, to adjudicate concerning the preliminary plan which the district court approved at the hearing. No objection has been made to any of its terms. The only complaint before us is that all

of the parks, playgrounds, and recreational facilities of the City of Memphis were not immediately desegregated by order of the district court. As to the preliminary plan approved by the court, we know that four of the seven municipal golf courses are presently available to colored people, as well as the principal amusement park. There may be others. There may have been an acceleration of the program; but appellants, as far as this case goes, are not interested in that question. Their claim is that no delay whatever is permissible; and that the allowance of any delay in the total desegregation of all Memphis recreational facilities deprives them of their constitutional rights.

As to the plan which the district court directed appellees to file, there is no objection to the approval of such plan, as it has not yet been filed, and the district court, necessarily, has been unable either to approve or disapprove such plan before the appeal was taken to this court.

We return, then, to the sole issue in the case raised by appellants: that the law permits of no delay on the part of the City of Memphis in effecting the desegregation of all of its parks and recreational facilities; that the district court was in error in not ordering all of the parks and recreational facilities to be immediately desegregated; and that the decision in Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, is inapplicable to a case involving public recreational facilities.

■ We are of the view that the principle stated in Brown v. Board of Education, supra, relating to the desegregation of schools, is applicable to the present case, involving the desegregation of recreational facilities of the City of Memphis. In our opinion the Brown decision is not limited to cases involving public schools, as is here contended by appellants. Detroit Housing Commission v. Lewis, 226 F.2d 180, 184, 185 (C.A.6); see also Cummings v. City of Charleston, 288 F.2d 817 (C.A.4).

In its findings of fact and conclusions of law, the district court said:

"Full implementation of the constitutional principles as announced in the Brown Case requires solution of varied local problems. Local authorities, and in this case the responsible Park Commission officials, have the primary responsibility of elucidating, assessing and solving these problems. The District Courts have the obligation of determining whether the action of local authorities constitutes good faith implementation of the governing constitutional principles; and in fashioning and effectuating decrees, the Court is guided by equitable principles. Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs."

"In determining whether defendants are acting in good faith in recognizing the constitutional rights of Negro citizens to make use of the Park Commission facilities on a non-segregated basis, it is proper for the Court to consider (1) local conditions and local problems as to facilities, and teacher or supervisory personnel, as well as local problems of maintaining, during the transition period, maximum recreational facilities for all citizens, White and Negro; (2) importance of time to accomplish change-over from a partially segregated system to an integrated one; (3) good will and understanding heretofore obtaining between the races, and (4) avoidance of confusion and turmoil and maintenance of law and order in the community during the transition period."

"Defendants have shown by a preponderance of the evidence that additional time is necessary to accomplish full desegregation of all facilities operated by the Memphis Park Commission, and defendants have

further shown that their plan and program for gradual desegregation is necessary, in the public interest, and is consistent with good faith implementation of the governing constitutional principles as announced in Brown vs. Board of Education, supra, taking into account all of the local conditions and problems hereinabove set out; and the Court has concluded, in the exercise of its discretion, that the prayer for the declaratory judgment and injunctive relief should be denied."

■ Considering the great number of parks, playgrounds, and recreational facilities maintained by the City of Memphis; the remarkably large number of children—65,000 white children and 35,000 Negro children—participating in the program under the guidance of trained supervisors and directors of planned recreation; the circumstances showing a substantial desegregation of many of the City's recreational facilities, prior to the hearing in the district court, and a continuing program of desegregation since that time; the evidence that immediate desegregation of all of the City's parks, playgrounds, and recreational facilities would result in great damage to the organized system of play for many children, and the probable closing of a number of recreational facilities, due to the necessity of providing considerable additional police protection and park supervision; the past and present success of the continuing plan of desegregation now being peacefully and harmoniously carried out by the City; the unquestioned good faith of the officials of the City and Park Commission in attempting to comply, in the field of recreation, with the opinion of the Supreme Court in Brown v. Board of Education, both before the hearing of this case in the district court, and since that time; the requirement that the Park Commission file a plan for desegregation of the City's park and recreational system to be subject to the approval of the district court; the fact that this appeal was taken before the plan, ordered by the court, was filed, and that the district court has never had an opportunity to approve or disapprove such a plan—these considerations require a determination that, under the circumstances of this case, there was a proper exercise of discretion by the district court in denying injunctive relief, in providing for a plan of desegregation to be filed by the Park Commission with the court, and in reserving jurisdiction for further proceedings in the case; and in accordance with the foregoing, the judgment of the district court is affirmed on the findings of fact and conclusions of law of Judge Boyd.