EVANS ET AL. *v.* NEWTON ET AL.

No. 61.   Argued November 9–10, 1965.—Decided January 17, 1966.

✗

⌐

*Jack Greenberg* argued the cause for petitioners.   With him on the briefs were *James M. Nabrit III, Michael Meltsner, Donald L. Hollowell* and *Charles L. Black, Jr.*

*C. Baxter Jones* and *Frank C. Jones* argued the cause for respondents. With them on the brief were *A. O. B. Sparks, Jr.,* and *Willis B. Sparks III.*

*Louis F. Claiborne,* by special leave of Court, argued the cause for the United States, as *amicus curiae,* urging reversal. On the brief were *Solicitor General Marshall, Assistant Attorney General Doar, Ralph S. Spritzer, David Rubin* and *James L. Kelley.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

In 1911 United States Senator Augustus O. Bacon executed a will that devised to the Mayor and Council of the City of Macon, Georgia, a tract of land which, after the death of the Senator's wife and daughters, was to be used as "a park and pleasure ground" for white people only, the Senator stating in the will that while he had only the kindest feeling for the Negroes he was of the opinion that "in their social relations the two races (white and negro) should be forever separate." The will provided that the park should be under the control of a Board of Managers of seven persons, all of whom were to be white. The city kept the park segregated for some years but in time let Negroes use it, taking the position that the park was a public facility which it could not constitutionally manage and maintain on a segregated basis.[1]

Thereupon, individual members of the Board of Managers of the park brought this suit in a state court against the City of Macon and the trustees of certain residuary beneficiaries of Senator Bacon's estate, asking that the city be removed as trustee and that the court

---

[1] *Watson* v. *Memphis,* 373 U. S. 526. And see *Mayor & City Council of Baltimore* v. *Dawson,* 350 U. S. 877 (beaches and bathhouses).

appoint new trustees, to whom title to the park would be transferred. The city answered, alleging it could not legally enforce racial segregation in the park. The other defendants admitted the allegation and requested that the city be removed as trustee.

Several Negro citizens of Macon intervened, alleging that the racial limitation was contrary to the laws and public policy of the United States, and asking that the court refuse to appoint private trustees. Thereafter the city resigned as trustee and amended its answer accordingly. Moreover, other heirs of Senator Bacon intervened and they and the defendants other than the city asked for reversion of the trust property to the Bacon estate in the event that the prayer of the petition were denied.

The Georgia court accepted the resignation of the city as trustee and appointed three individuals as new trustees, finding it unnecessary to pass on the other claims of the heirs. On appeal by the Negro intervenors, the Supreme Court of Georgia affirmed, holding that Senator Bacon had the right to give and bequeath his property to a limited class, that charitable trusts are subject to supervision of a court of equity, and that the power to appoint new trustees so that the purpose of the trust would not fail was clear. 220 Ga. 280, 138 S. E. 2d 573. The case is here on a writ of certiorari. 380 U. S. 971.

There are two complementary principles to be reconciled in this case. One is the right of the individual to pick his own associates so as to express his preferences and dislikes, and to fashion his private life by joining such clubs and groups as he chooses. The other is the constitutional ban in the Equal Protection Clause of the Fourteenth Amendment against state-sponsored racial inequality, which of course bars a city from acting as trustee under a private will that serves the racial segregation cause. *Pennsylvania* v. *Board of Trusts,* 353 U. S.

230. A private golf club, however, restricted to either Negro or white membership is one expression of freedom of association. But a municipal golf course that serves only one race is state activity indicating a preference on a matter as to which the State must be neutral.[2] What is "private" action and what is "state" action is not always easy to determine. See *Burton* v. *Wilmington Parking Authority*, 365 U. S. 715. Conduct that is formally "private" may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action. The action of a city in serving as trustee of property under a private will serving the segregated cause is an obvious example. See *Pennsylvania* v. *Board of Trusts, supra.* A town may be privately owned and managed, but that does not necessarily allow the company to treat it as if it were wholly in the private sector. Thus we held in *Marsh* v. *Alabama,* 326 U. S. 501, that the exercise of constitutionally protected rights on the public streets of a company town could not be denied by the owner. A State is not justified, we said, in "permitting a corporation to govern a community of citizens so as to restrict their fundamental liberties . . . ." *Id.,* at 509. We have also held that where a State delegates an aspect of the elective process to private groups, they become subject to the same restraints as the State. *Terry* v. *Adams,* 345 U. S. 461. That is to say, when private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations.

Yet generalizations do not decide concrete cases. "Only by sifting facts and weighing circumstances"

[2] *Holmes* v. *City of Atlanta,* 350 U. S. 879; *New Orleans Park Assn.* v. *Detiege,* 358 U. S. 54.

(*Burton* v. *Wilmington Parking Authority, supra,* at 722) can we determine whether the reach of the Fourteenth Amendment extends to a particular case. The range of governmental activities is broad and varied, and the fact that government has engaged in a particular activity does not necessarily mean that an individual entrepreneur or manager of the same kind of undertaking suffers the same constitutional inhibitions. While a State may not segregate public schools so as to exclude one or more religious groups, those sects may maintain their own parochial educational systems. *Pierce* v. *Society of Sisters,* 268 U. S. 510.

If a testator wanted to leave a school or center for the use of one race only and in no way implicated the State in the supervision, control, or management of that facility, we assume *arguendo* that no constitutional difficulty would be encountered.[3]

---

[3] It is argued that this park was a product of Georgia's policy to allow charitable trusts of public facilities to be segregated. A Georgia statute permitted any person to grant a municipal corporation land in trust to the public use as a park on a racially segregated basis. Ga. Code Ann. § 69–504. And a companion measure authorized municipal corporations to accept such grants and to enforce the racial limitations. *Id.,* § 69–505. This policy, it is urged, had a "coercive effect" (*Lombard* v. *Louisiana,* 373 U. S. 267, 273) implicating Georgia in racial discrimination, for without that legislative pattern for segregation a testator would have had to travel an uncertain course to reach that end. Before § 69–504 was enacted in 1905, an attempt to establish a trust such as this would have faced numerous difficulties. The pre-1905 statutory law did not expressly include parks as a proper subject of charitable trusts, although it was specific in other regards. See Ga. Code § 4008 (1895). And Georgia's public parks were conceived of as "dedicated" commons with an easement in favor of the general public. See *Mayor & Council of Macon* v. *Franklin,* 12 Ga. 239. The concept of dedication meant that the property was to benefit the public as a whole. *Ford* v. *Harris,* 95 Ga. 97, 101, 22 S. E. 144, 145; *East Atlanta Land Co.* v. *Mower,* 138 Ga. 380, 388, 75 S. E. 418, 422. It would have

This park, however, is in a different posture. For years it was an integral part of the City of Macon's activities. From the pleadings we assume it was swept, manicured, watered, patrolled, and maintained by the city as a public facility for whites only, as well as granted tax exemption under Ga. Code Ann. § 92–201. The momentum it acquired as a public facility is certainly not dissipated *ipso facto* by the appointment of "private" trustees. So far as this record shows, there has been no change in municipal maintenance and concern over this facility. Whether these public characteristics will in time be dissipated is wholly conjectural. If the municipality remains entwined in the management or control of the park, it remains subject to the restraints of the Fourteenth Amendment just as the private utility in *Public Utilities Comm'n* v. *Pollak,* 343 U. S. 451, 462, remained subject to the Fifth Amendment because of the surveillance which federal agencies had over its affairs. We only hold that where the tradition of municipal control had become firmly established, we cannot take judicial notice that the mere substitution of trustees instantly transferred this park from the public to the private sector.

This conclusion is buttressed by the nature of the service rendered the community by a park. The service rendered even by a private park of this character is municipal in nature. It is open to every white person, there being no selective element other than race. Golf

---

posed conceptual difficulties, to say the least, to dedicate land to the public as a whole, at the same time excluding the members of the Negro race. Cf. *Brown* v. *Gunn,* 75 Ga. 441, in which this point was disposed of only by finding that, on the particular facts of that case, there was no "dedication." We think it likely that it was the very difficulties discussed here that § 69–504 was intended to eliminate. We do not, however, reach the question whether the State facilitated, through this legislative action, the establishment of segregated parks.

clubs, social centers, luncheon clubs, schools such as Tuskegee was at least in origin,[4] and other like organizations in the private sector are often racially oriented. A park, on the other hand, is more like a fire department or police department that traditionally serves the community. Mass recreation through the use of parks is plainly in the public domain, *Watson* v. *Memphis,* 373 U. S. 526; and state courts that aid private parties to perform that public function on a segregated basis implicate the State in conduct proscribed by the Fourteenth Amendment. Like the streets of the company town in *Marsh* v. *Alabama, supra,* the elective process of *Terry* v. *Adams, supra,* and the transit system of *Public Utilities Comm'n* v. *Pollak, supra,* the predominant character and purpose of this park are municipal.

Under the circumstances of this case, we cannot but conclude that the public character of this park requires that it be treated as a public institution subject to the command of the Fourteenth Amendment, regardless of who now has title under state law. We may fairly assume that had the Georgia courts been of the view that even in private hands the park may not be operated for the public on a segregated basis, the resignation would not have been approved and private trustees appointed. We put the matter that way because on this record we cannot say that the transfer of title *per se* disentangled the park from segregation under the municipal regime that long controlled it.

Since the judgment below gives effect to that purpose, it must be and is     *Reversed.*

MR. JUSTICE WHITE.

As MR. JUSTICE BLACK emphasizes, this case comes to us in the very narrow context of a state court judgment

---

[4] Ala. Laws 1880–1881, pp. 395–396; Ala. Laws, 1882–1883, pp. 392–393.

accepting the resignation of a trustee and appointing successor trustees. The lower court judgment does not enjoin the new trustees to comply with the racial restriction in the trust, and there is therefore not presented for decision the question whether, should the trustees fail to exclude Negroes from the park, state judicial enforcement of the racial restriction would constitute discriminatory state action forbidden by the Equal Protection Clause of the Fourteenth Amendment. See *Bell* v. *Maryland,* 378 U. S. 226, 328–331 (dissenting opinion). But we do have properly before us, in my opinion, the question of whether the Fourteenth Amendment prohibits the new trustees from voluntarily excluding Negroes. This is so because decision of the state law questions in this case was not independent of that federal question. The city's resignation, its acceptance by the state courts, and the appointment of new trustees were all based on the premise that the city could not, but private trustees could, obey the racial restriction in the trust without violation of the Federal Constitution. If that premise was incorrect, this Court should vacate the judgment below and remand for further consideration of the state law issues free from the compulsion of an erroneous view of federal law. *Missouri ex rel. Southern R. Co.* v. *Mayfield,* 340 U. S. 1, 5; *Minnesota* v. *National Tea Co.,* 309 U. S. 551; *State Tax Comm'n* v. *Van Cott,* 306 U. S. 511.

That the Fourteenth Amendment prohibits operation of the park on a segregated basis so long as the city is trustee is of course not disputed. See cases cited by the majority, *ante,* n. 1. Whether the successor trustees may themselves operate the park on a segregated basis is the question. The majority holds that they may not. I agree, but for different reasons.

To a large extent the majority grounds its conclusion that exclusion of Negroes from the park after the change

in trustees would be state action and thus violative of the Fourteenth Amendment on the existence of prior municipal involvement in the operation of the park.

> "The momentum [the park] acquired as a public facility is certainly not dissipated *ipso facto* by the appointment of 'private' trustees. So far as this record shows, there has been no change in municipal maintenance and concern over this facility. Whether these public characteristics will in time be dissipated is wholly conjectural. . . . We only hold that where the tradition of municipal control had become firmly established, we cannot take judicial notice that the mere substitution of trustees instantly transferred this park from the public to the private sector." *Ante,* at 301.

It is equally evident that the record does not show continued involvement of the city in the operation of the park—the record is silent on this point. On the contrary, the city's interest would seem to lead it to cut all ties with the operation of the park. It must be as clear to the city as to this Court that if the city remains "entwined in the management or control of the park, it remains subject to the restraints of the Fourteenth Amendment," *ante,* p. 301; and should segregation in the park be barred, the residuary beneficiaries would undoubtedly press their claim that failure of the trust purpose expressed in the racial restriction results in reversion of the park property. It seems unlikely that the city would act so as unnecessarily to jeopardize the continued existence of this centrally located park, which comprises about 100 acres and is one of the city's largest parks.

That the city's own interest might lead it to extricate itself at once from operation of the park does not, of course, necessarily mean that it has done so; and I am no more inclined than the majority to resolve this ques-

tion by conjecture. I refer to possible inferences from the city's self-interest solely to emphasize that the record affords absolutely no basis for inferring continued involvement of the city in the management and control of the park. What the majority has done is to raise a presumption of one fact by showing the absence of proof of the converse. To postulate in this manner that the city's involvement has not been dissipated is simply a disguised form of conjecture and, I submit, is an insufficient basis for decision of this case.

I would nevertheless hold that the racial condition in the trust may not be given effect by the new trustees because, in my view, it is incurably tainted by discriminatory state legislation validating such a condition under state law. The state legislation to which I refer is §§ 69–504 and 69–505 of the Georgia Code, which were adopted in 1905, just six years before Senator Bacon's will was executed. Sections 69–504 and 69–505 make lawful charitable trusts "dedicated in perpetuity to the public use as a park, pleasure ground, or for other public purpose" and provide that "the use of said park, pleasure ground, or other property so conveyed to said municipality [may] be limited to the white race only, or to white women and children only, or to the colored race only, or to colored women and children only, or to any other race, or to the women and children of any other race only . . . ." [1]

---

[1] "69–504. *Gifts for public parks or pleasure grounds.*—Any person may, by appropriate conveyance, devise, give, or grant to any municipal corporation of this State, in fee simple or in trust, or to other persons as trustees, lands by said conveyance dedicated in perpetuity to the public use as a park, pleasure ground, or for other public purpose, and in said conveyance, by appropriate limitations and conditions, provide that the use of said park, pleasure ground, or other property so conveyed to said municipality shall be limited to the white race only, or to white women and children only, or to the colored race only, or to colored women and children only, or to

As this legislation does not compel a trust settlor to condition his grant upon use only by a racially designated class, the State cannot be said to have directly coerced private discrimination. Nevertheless, if the validity of the racial condition in Senator Bacon's trust would have been in doubt but for the 1905 statute and if the statute removed such doubt only for racial restrictions, leaving the validity of nonracial restrictions still in question, the absence of coercive language in the legislation would not prevent application of the Fourteenth Amendment. For such a statute would depart from a policy of strict neutrality in matters of private discrimination by enlisting the State's assistance only in aid of racial discrimination and would so involve the State in the private choice as to convert the infected private discrimination into state action subject to the Fourteenth Amendment. Compare *Robinson* v. *Florida,* 378 U. S. 153; *Lombard* v. *Louisiana,* 373 U. S. 267; *Peterson* v. *City of Greenville,* 373 U. S. 244. Although there are no Georgia decisions directly on the point and the question is therefore not free from doubt, the available authorities

---

any other race, or to the women and children of any other race only, that may be designated by said devisor or grantor; and any person may also, by such conveyance, devise, give, or grant in perpetuity to such corporations or persons other property, real or personal, for the development, improvement, and maintenance of said property.

"69–505. *Municipality authorized to accept.*—Any municipal corporation, or other persons natural or artificial, as trustees, to whom such devise, gift, or grant is made, may accept the same in behalf of and for the benefit of the class of persons named in the conveyance, and for their exclusive use and enjoyment; with the right to the municipality or trustees to improve, embellish, and ornament the land so granted as a public park, or for other public use as herein specified, and every municipal corporation to which such conveyance shall be made shall have power, by appropriate police provision, to protect the class of persons for whose benefit the devise or grant is made, in the exclusive used [*sic*] and enjoyment thereof." Ga. Code Ann. §§ 69–504 and 69–505 (1957).

have led me to conclude that §§ 69–504 and 69–505 did involve the State in the private choice by favoring private racial discrimination over private discrimination based on grounds other than race.

Apart from §§ 69–504 and 69–505, the Georgia statute governing the determination of permissible objects of charitable trusts is § 108–203.[2] This statute "almost copies the statute of 43d Elizabeth," *Newson* v. *Starke*, 46 Ga. 88, 92 (1872), and has the effect of fully adopting in Georgia the common law of charities, *Jones* v. *Habersham*, 107 U. S. 174, 180. We may therefore expect general charitable trust principles to be as fully applicable in Georgia as elsewhere in the several States. Under such principles, there is grave doubt concerning whether a charitable trust for a park could be limited to the use of less than the whole public.

In the leading case of *Commissioners for Special Purposes of Income Tax* v. *Pemsel*, [1891] A. C. 531, 583, Lord Macnaghten established the classification of charitable trusts that, with some modifications, has since prevailed:

> " 'Charity' in its legal sense comprises four principal divisions: trusts for the relief of poverty; trusts for the advancement of education; trusts for the ad-

---

[2] "108–203. *Subjects of charity.*—The following subjects are proper matters of charity for the jurisdiction of equity:

"1. Relief of aged, impotent, diseased, or poor people.

"2. Every educational purpose.

"3. Religious instruction or worship.

"4. Construction or repair of public works, or highways, or other public conveniences.

"5. Promotion of any craft or persons engaging therein.

"6. Redemption or relief of prisoners or captives.

"7. Improvement or repair of cemeteries or tombstones.

"8. Other similar subjects, having for their object the relief of human suffering or the promotion of human civilization." Ga. Code Ann. § 108–203 (1959).

vancement of religion; and trusts for other purposes beneficial to the community, not falling under any of the preceding heads."

See also Restatement (Second), Trusts § 368 (1959). A more general test of what is charitable is whether the accomplishment of the trust purpose "is of such social interest to the community as to justify permitting property to be devoted to the purpose in perpetuity." IV Scott on Trusts § 368, at 2629–2630 (2d ed. 1956). The first three categories identified by Lord Macnaghten designate trust purposes that have long been recognized as beneficial to the community as a whole—whether or not immediate benefit is restricted to a relatively small group—and that therefore satisfy the general test stated by Professor Scott. See Restatement (Second), Trusts § 374, comment *a* (1959). But the present trust falls under the fourth category and can therefore be sustained as charitable only because the generality of user beneficiaries establishes that it is beneficial to the community. Otherwise a trust to establish a country club for the use of the residents of the wealthiest part of town would be charitable. Professor Scott states this principle as follows:

"As we have seen, a trust to promote the happiness or well-being of members of the community is charitable, although it is not a trust to relieve poverty, advance education, promote religion or protect health. In such a case, however, *the trust must be for the benefit of the members of the community generally* and not merely for the benefit of a class of persons." IV Scott on Trusts § 375.2, at 2715 (2d ed. 1956). (Emphasis added.)

Accord, *Trustees of New Castle Common* v. *Megginson,* 1 Boyce 361, 376, 77 A. 565, 571 (Sup. Ct. Del. 1910)

(trust for town common was charitable; "[i]t is public, because it relates to all the inhabitants of a particular community and not to any classification of such inhabitants, or to any group thereof separately from the other inhabitants by any distinction of race, creed, social rank, wealth, poverty, occupation, or business . . ."); Restatement, Trusts § 375, comments *a* and *c* (1935); Restatement (Second), Trusts § 375, comment *a* (1959); see also Bogert on Trusts § 378 (2d ed. 1964).[3] Apart

---

[3] This precise question had been mooted in England a few years before the 1905 Georgia enactment in the case of *In re Christchurch Inclosure Act,* 38 Ch. D. 520 (1888), aff'd, [1893] A. C. 1, and it appears the English rule may differ from the American rule. The Christchurch Inclosure Act gave tenants in certain cottages the right in a designated common to cut turf for fuel. In the case before the court, it was clear the act had to be given effect in some manner, but the court expressed great difficulty in giving it effect as creating a charitable trust. "For, although the occupiers of these cottages may have been, and perhaps were, poor people, the trust is not for the poor occupiers, but for all the then and future occupiers, whether poor or not. Moreover, the trust is not for the inhabitants of a parish or district, but only for some of such persons." *Id.,* at 530. Nevertheless, the court felt bound to hold such a trust was charitable on the authority of a dictum by Lord Selborne in *Goodman* v. *Mayor of Saltash,* 7 App. Cas. 633, 642 (1882) (trust for a fishery for the use of all "free inhabitants of ancient tenements" held charitable), that "[a] gift subject to a condition or trust 'for the benefit of the inhabitants of a parish or town, or of any particular class of such inhabitants, is (as I understand the law) a charitable trust . . . ." Lord Blackburn dissented in *Goodman* v. *Mayor of Saltash,* saying that "though there are many cases to the effect that a trust for public purposes, not confined to the poor, may be considered charitable for many purposes, I do not know of any that say that such a trust as is now supposed would be taken out of the rule against perpetuities . . . ." *Id.,* at 662. No doubt Lord Selborne's view of what constituted a trust for the benefit of the public generally was colored by feudal traditions and the long history of royal charters to the burghers, or "free inhabitants" of a town (in

from the present case, no Georgia cases dealing with trusts for general community purposes have been found, see Smith, The Validity of Charitable Gifts in Georgia, 1 Ga. B. J. 16, 26–27 (Feb. 1939), but the available Georgia authorities are consistent with the rule enunciated by Scott. Compare *Bramblett* v. *Trust Co. of Georgia*, 182 Ga. 87, 185 S. E. 72 (1936) (trust to establish "home for gentlewomen" not charitable), with *Houston* v. *Mills Memorial Home,* 202 Ga. 540, 43 S. E. 2d 680 (1947) (trust for Negro old folks' home is charitable).[4] On the whole, therefore, I conclude that prior to the 1905 legislation it would have been extremely doubtful whether § 108–203 authorized a trust for park purposes when a portion of the public was to be excluded from the park.

Sections 69–504 and 69–505 clearly permit exclusion of a portion of the public if such exclusion is on racial grounds. At the same time, those sections appear to make nonracial restrictions on the user of a park created by trust even more doubtful. Section 69–504 authorizes the conveyance of land "dedicated in perpetuity to the public use as a park" and also provides that such a conveyance may limit user on racial grounds. The natural construction of this provision would be that it authorizes a trust only for the use of the whole public

---

fact, the trust in *Goodman* v. *Mayor of Saltash* was a fictional one created by supposing the prior existence of such a charter, now lost), while the American rule enunciated by Scott is in keeping with the American democratic tradition, which in turn is reflected by the Georgia cases regarding dedication of land to public use discussed by the majority, *ante,* at 300–301, n. 3.

[4] The trust in *Mills Memorial Home* was specifically recognized as charitable by § 108–203 (1) ("Relief of aged, impotent, diseased, or poor people"), see note 2, *supra,* while the trust in *Bramblett* would be classifiable as one to promote the happiness or well-being of members of the community at large and would thus be tested by the standard of generality stated by Professor Scott.

or for the use of a racially designated subpart of the public, but not for the use of some other portion of the public such as men only or Irish persons only. Such an interpretation follows from the maxim *expressio unius est exclusio alterius* and from the dedication cases to which the majority refers, *ante*, at 300–301, n. 3, which indicate that the expression "dedicated in perpetuity to the public use as a park" means dedication to the public as a whole and not some portion of the public. See also *Western Union Telegraph Co.* v. *Georgia R. & Banking Co.*, 227 F. 276, 285 (D. C. S. D. Ga. 1915). (" 'There can be no dedication, strictly speaking, to private uses, nor even to uses public in their nature, but the enjoyment of which is restricted to a limited part of the public.' ") One commentator has suggested that § 69–504 was intended to expand clause 4 of § 108–203, see note 2, *supra, i. e.,* "to enlarge 'public works' or 'public conveniences' to include public parks or pleasure grounds . . . ." Smith, The Validity of Charitable Gifts in Georgia, 1 Ga. B. J. 16, 27 (Feb. 1939). On that assumption, the sole authority for holding gifts in trust for park purposes to be charitable would be § 69–504, and that section clearly makes nonracial restrictions on use of such parks more doubtful than racial restrictions. Even if § 69–504 is regarded as a clarification of prior law, rather than an addition to it, it has the same effect of casting doubt on the validity of nonracial restrictions.

This case must accordingly be viewed as one where the State has forbidden all private discrimination except racial discrimination. As a result, "the State through its regulations has become involved to such a significant extent" in bringing about the discriminatory provision in Senator Bacon's trust that the racial restriction "must be held to reflect . . . state policy and therefore to violate the Fourteenth Amendment." *Robinson* v. *Florida,*

378 U. S. 153, 156–157. For the reasons stated, I would vacate the judgment of the Georgia court and remand the case for further proceedings.

Mr. Justice Black, dissenting.

I find nothing in the United States Constitution that compels any city or other state subdivision to hold title to property it does not want or to act as trustee under a will when it chooses not to do so. And I had supposed until now that the narrow question of whether a city could resign such a trusteeship and whether a state court could appoint successor trustees depended entirely on state law. Here, however, the Court assumes that federal power exists to reverse the Supreme Court of Georgia for affirming a Georgia trial court's decree which, as the State Supreme Court held, did only these "two things: (1) Accepted the resignation of the City of Macon as trustee of Baconsfield; and (2) appointed new trustees." 220 Ga. 280, 284; 138 S. E. 2d 573, 576.

The State Supreme Court's interpretation of the scope and effect of this Georgia decree should be binding upon us unless the State Supreme Court has somehow lost its power to control and limit the scope and effect of Georgia trial court decrees relating to Georgia wills creating Georgia trusts of Georgia property. A holding that ignores this state power would be so destructive of our state judicial systems that it could find no support, I think, in our Federal Constitution or in any of this Court's prior decisions. For myself, I therefore accept the decision of the Georgia Supreme Court as holding only what it declared it held, namely, that the trial court committed no error under Georgia law in accepting the City of Macon's resignation as trustee and in appointing successor trustees to execute the Bacon trust.

I am not sure that the Court is passing at all on the only two questions the Georgia Supreme Court decided

in approving the city's resignation as trustee and the appointment of successors. If the Court is holding that a State is without these powers, it is certainly a drastic departure from settled constitutional doctrine and a vastly important one which, I cannot refrain from saying, deserves a clearer explication than it is given. Ambiguity cannot, however, conceal the revolutionary nature of such a holding, if this is the Court's holding, nor successfully obscure the tremendous lopping off of power heretofore uniformly conceded by all to belong to the States. This ambiguous and confusing disposition of such highly important questions is particularly disturbing to me because the Court's discussion of the constitutional status of the park comes in the nature of an advisory opinion on federal constitutional questions the Georgia Supreme Court did not decide. Consequently, for all the foregoing reasons and particularly since the Georgia courts decided no federal constitutional question, I agree with my Brother HARLAN that the writ of certiorari should have been dismissed as improvidently granted.

Questions of this Court's jurisdiction would be different, of course, if either the mere resignation or appointment of trustees under a will was prohibited by some federal constitutional provision. But there is none. The Court implies, however, that the city's resignation and the state court's appointment of new trustees amounted to "state-sponsored racial inequality," which, of course, if correct, would present a federal constitutional question. This suggestion rests on a further implication by the Court that the Georgia court's decree would result in the operation of Baconsfield Park on a racially segregated basis. The record here, for several reasons, can support no such implications: (1) the State Supreme Court specifically limited the effect of the decree it affirmed to approval of the city's resignation as trustee and the appointment of new ones; (2) the new

trustees were not directed to operate the park on a discriminatory basis; and (3) there is no indication that they have done so. Furthermore, where a valid law makes a certain use of property held in trust illegal, responsibility for its illegal use cannot be escaped by putting it in the hands of new trustees. Cf., *e. g., Mormon Church* v. *United States,* 136 U. S. 1, 47–48.

The ambiguous language used by the Court even casts doubt upon Georgia's power to hold that the trust property here can revert to the heirs of Senator Bacon if the conditions upon which he created the trust should become impossible to carry out. The heirs of Senator Bacon raised the issue of reversion below, but neither court reached it. So far as I have been able to find, the power of a State to decide such a question has been taken for granted in every prior opinion this Court has ever written touching this subject. I believe that Georgia's complete power to decide this question is so clear that no doubt should be cast on it as I think the Court's opinion does. But if this Court is to exercise jurisdiction in this case and hold, despite the fact that the state court's decree did not adjudicate any such question, that the new successor trustees cannot constitutionally operate the park in accordance with Senator Bacon's will, then I think that the Court should explicitly state that the question of reversion to his heirs is controlled by state law and remand the case to the Georgia Supreme Court to decide that question.

Nothing that I have said is to be taken as implying that Baconsfield Park could at this time be operated by successor trustees on a racially discriminatory basis. Questions of equal protection of all people without discrimination on account of color are of paramount importance in this Government dedicated to equal justice for all. We can accord that esteemed principle the respect

it is due, however, without distorting the constitutional structure of our Government by taking away from the States that which is their due.

MR. JUSTICE HARLAN, whom MR. JUSTICE STEWART joins, dissenting.

This decision, in my opinion, is more the product of human impulses, which I fully share, than of solid constitutional thinking. It is made at the sacrifice of long-established and still wise procedural and substantive constitutional principle. I must respectfully dissent.

## I.

In my view the writ should be dismissed as improvidently granted because the far-reaching constitutional question tendered is not presented by this record with sufficient clarity to require or justify its adjudication, assuming that the question is presented at all.

In the posture in which this case reached the state courts it required of them no more than approval of the city's resignation as trustee under Senator Bacon's will and the appointment of successor trustees. Neither of these issues of course would in itself present a federal question. While I am inclined to agree with my Brother BLACK that this is all the state courts decided, I think it must be recognized that the record is not wholly free from ambiguity on this score. Even so, the writ should be dismissed. To infer from the Georgia Supreme Court's opinion, as the majority here does, a further holding that the new trustees are entitled to operate Baconsfield on a racially restricted basis, is to stretch for a constitutional issue. This plainly contravenes the established rule that this Court will not reach constitutional questions if their decision can reasonably be avoided. *Peters* v. *Hobby*, 349 U. S. 331; *United States* v. *Rumely*,

345 U. S. 41; *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 420, 553. Application of that doctrine is especially called for here where decision should require precise knowledge of the factual details and nuances that only time and a complete record can bring into focus. Dismissal of the writ should thus follow.

## II.

On the merits, which I reach only because the Court has done so, I do not think that the Fourteenth Amendment permits this Court in effect to frustrate the terms of Senator Bacon's will, now that the City of Macon is no longer connected, so far as the record shows, with the administration of Baconsfield. If the majority is in doubt that such is the case, it should remand for findings on that issue and not reverse.

The Equal Protection Clause reaches only discriminations that are the product of capricious state action; it does not touch discriminations whose origins and effectuation arise solely out of individual predilections, prejudices, and acts. *Civil Rights Cases*, 109 U. S. 3. So far as the Fourteenth Amendment is concerned the curtailing of private discriminatory acts, to the extent they may be forbidden at all, is a matter that is left to the States acting within the permissible range of their police power.

From all that now appears, this is a case of "private discrimination." Baconsfield had its origin not in any significant governmental action [1] or on any public land

---

[1] The majority disclaims reliance on the early Georgia charitable trust statutes authorizing the establishment of racially restricted parks and permitting a city to act as trustee under such a trust. My Brother WHITE, however, finds that the mere existence of those statutes, enacted in 1905, "incurably taint[s]" the racial conditions of Senator Bacon's will (*ante*, p. 305). For several reasons that thesis seems to me to fall short. First, it is by no means clear that

but rather in the personal social philosophy of Senator Bacon and on property owned by him. The City of Macon's acceptance and, until recent years, its carrying out of the trusteeship were both entirely legitimate, and indeed in accord with the prevailing *mores* of the times. When continuance of its trusteeship became incompatible with later changes in constitutional doctrine, the city first undertook to disregard the racial restrictions imposed by the will on the use of the park, and then when that action was appropriately challenged, resigned as trustee. The state courts, obedient to federal commands, *Pennsylvania* v. *Board of Trusts,* 353 U. S. 230, have accepted the resignation of the city, and, to prevent failure of the trust under their own laws, have appointed new trustees. I can see nothing in this straightforward

---

Georgia common law would not have permitted user restrictions on such a park in trust, so that the statute was but declaratory of existing law *pro tanto.* See, *e. g., Houston* v. *Mills Memorial Home,* 202 Ga. 540, 43 S. E. 2d 680 (permitting trust for home for Negro aged). Thus even on my Brother WHITE's premise that a State in allowing discrimination may not discriminate among possible user restrictions, the proper course would be to remand to the Georgia courts to determine whether user-restricted trusts such as Senator Bacon's were in any event valid under the state common law. Second, in order to find an "incurable taint" of the racial conditions rather than an arguable claim turning on state common law, it is apparently suggested that the state statutes invalidly "removed . . . doubt only for racial restrictions" (*ante,* p. 306) and by this clarification improperly encouraged Senator Bacon to discriminate. There is, however, absolutely no indication whatever in the record that Senator Bacon would have acted otherwise but for the statute, a gap in reasoning that cannot be obscured by general discussion of state "involvement" or "infection." Third, it could hardly be argued that the statute in question was unconstitutional when passed, in light of the then-prevailing constitutional doctrine; that being so, it is difficult to perceive how it can now be taken to have tainted Senator Bacon's will at the time he made his irrevocable choice.

318

train of events which justifies finding "state action" of the kind necessary to bring the Fourteenth Amendment into play.

The first ground for the majority's state action holding rests on nothing but an assumption and a conjecture. The assumption is that the city itself maintained Baconsfield in the past. The conjecture is that it will continue to be connected with the administration of the park in the future. The only underpinning for the assumption is the circumstance that over the years Baconsfield has geographically become an adjunct to the city's park system and the admitted fact that until the present proceeding, title to it was vested in the city as trustee. The only predicate for the majority's conjecture as to the future is the failure of the record to show the contrary.

If speculation is the test, the record more readily supports contrary inferences. Papers before us indicate that Senator Bacon left other property in trust precisely in order to maintain Baconsfield.[2] Why should it be assumed that these resources were not used in the past for that purpose, still less that the new trustees, now faced with a challenge as to their right to effectuate the terms of Senator Bacon's trust, will not keep Baconsfield privately maintained in all respects? Further, the city's and state courts' readiness to sever ties between the city and park in derogation of the will, let alone the city's earlier operation of the park on a nonsegregated basis despite the terms of the will, strongly indicates that they will not flinch from completing the separation of park and state if any ties remain to implicate the Fourteenth Amendment.

[2] See R. 20, 22, for provisions of Senator Bacon's will allotting property for "the management, improvement and preservation" of the park.

For me this facet of the majority's opinion affords a wholly unacceptable basis for imputing unconstitutional state action, resting as it does on pure surmise and conjecture, and implausible ones at that.[3]

## III.

Quite evidently uneasy with its first ground of decision, the majority advances another which ultimately emerges as the real holding. This ground derives from what is asserted to be the "public character" (*ante,* p. 302) of Baconsfield and the "municipal . . . nature" of its services (*ante,* p. 301). Here it is not suggested that Baconsfield will use public property or funds, be managed by the city, enjoy an exclusive franchise, or even operate under continuing supervision of a public regulatory agency. State action is inherent in the operation of Baconsfield quite independently of any such factors, so it seems to be said, because a privately operated park whose only criterion for exclusion is racial is within the "public domain" (*ante,* p. 302).

Except for one case which will be found to be a shaky precedent, the cases cited by the majority do not support this novel state action theory. *Public Utilities*

---

[3] Twice in its opinion the majority intimates it might reach a different conclusion on the city's involvement if it had a fully developed record before it. At p. 301, *ante,* the Court says, "We only hold that where the tradition of municipal control had become firmly established, we cannot take judicial notice that the mere substitution of trustees instantly transferred this park from the public to the private sector." And in concluding at p. 302, *ante,* the opinion reads: "We put the matter that way because on this record we cannot say that the transfer of title *per se* disentangled the park from segregation under the municipal regime that long controlled it." These cautions seem to reinforce the point made at the outset of this dissent that the Court should have refused to adjudicate the constitutional issue on this cloudy record. See *Rescue Army* v. *Municipal Court,* 331 U. S. 549.

*Comm'n* v. *Pollak,* 343 U. S. 451, applied due process standards, limited like equal protection standards to instances involving state action, to certain action of a private citywide transit company. State action was explicitly premised on the close legal regulation of the company by the public utilities commission and the commission's approval of the particular action under attack. The conclusion might alternatively have rested on the near-exclusive legal monopoly enjoyed by the company, 343 U. S., at 454, n. 1, but in all events nothing was rested on any "public function" theory. *Watson* v. *Memphis,* 373 U. S. 526, ordering speedy desegregation of parks in that city, concerned recreation facilities concededly owned or managed by the city government. See 303 F. 2d 863, 864–865.[4] The only Fourteenth Amendment case [5] finding state action in the "public function" performed by a technically private institution is *Marsh* v. *Alabama,* 326 U. S. 501, holding that a company-owned town of over 1,500 residents and effectively integrated into the surrounding area could not suppress free speech on its streets in disregard of constitutional safeguards.

---

[4] The majority's language directly following its *Watson* citation (*ante,* p. 302)—"and state courts that aid private parties to perform that public function [mass recreation through the use of parks] on a segregated basis implicate the State in conduct proscribed by the Fourteenth Amendment"—quite evidently is oblique reliance on *Shelley* v. *Kraemer,* 334 U. S. 1, which the majority does not even cite. Whatever may be the basis of that inscrutable decision, certainly nothing in it purports to rest on anything resembling the "public function" theory.

[5] In *Terry* v. *Adams,* 345 U. S. 461, cited by the Court, none of the three prevailing opinions garnered a majority, and some commentators have simply concluded that the state action requirement was read out of the Fifteenth Amendment on that occasion. Lewis, The Meaning of State Action, 60 Col. L. Rev. 1083, 1094 (1960); Note, The Strange Career of "State Action" Under the Fifteenth Amendment, 74 Yale L. J. 1448, 1456–1459 (1965).

While no stronger case for the "public function" theory can be imagined, the majority opinion won only five of the eight Justices participating, one of whom also concurred separately, and three spoke out in dissent. The doctrine of that case has not since been the basis of other decisions in this Court and certainly it has not been extended. On the contrary, several years after the decision this Court declined to review two New York cases which in turn held *Marsh* inapplicable to a privately operated residential community of apartment buildings housing 35,000 residents, *Watchtower Bible & Tract Soc'y* v. *Metropolitan Life Ins. Co.,* 297 N. Y. 339, 79 N. E. 2d 433, certiorari denied, 335 U. S. 886, and to a privately owned housing development of 25,000 people alleged to discriminate on racial grounds, *Dorsey* v. *Stuyvesant Town Corp.,* 299 N. Y. 512, 87 N. E. 2d 541, certiorari denied, 339 U. S. 981. See also *Hall* v. *Virginia,* 335 U. S. 875, dismissing the appeal in 188 Va. 72, 49 S. E. 2d 369.

More serious than the absence of any firm doctrinal support for this theory of state action are its potentialities for the future. Its failing as a principle of decision in the realm of Fourteenth Amendment concerns can be shown by comparing—among other examples that might be drawn from the still unfolding sweep of governmental functions—the "public function" of privately established schools with that of privately owned parks. Like parks, the purpose schools serve is important to the public. Like parks, private control exists, but there is also a very strong tradition of public control in this field. Like parks, schools may be available to almost anyone of one race or religion but to no others. Like parks, there are normally alternatives for those shut out but there may also be inconveniences and disadvantages caused by the restriction. Like parks, the extent of school intimacy varies greatly depending on the size and character of the institution.

For all the resemblance, the majority assumes that its decision leaves unaffected the traditional view that the Fourteenth Amendment does not compel private schools to adapt their admission policies to its requirements, but that such matters are left to the States acting within constitutional bounds. I find it difficult, however, to avoid the conclusion that this decision opens the door to reversal of these basic constitutional concepts, and, at least in logic, jeopardizes the existence of denominationally restricted schools while making of every college entrance rejection letter a potential Fourteenth Amendment question.

While this process of analogy might be spun out to reach privately owned orphanages, libraries, garbage collection companies, detective agencies, and a host of other functions commonly regarded as nongovernmental though paralleling fields of governmental activity, the example of schools is, I think, sufficient to indicate the pervasive potentialities of this "public function" theory of state action. It substitutes for the comparatively clear and concrete tests of state action a catch-phrase approach as vague and amorphous as it is far-reaching. It dispenses with the sound and careful principles of past decisions in this realm. And it carries the seeds of transferring to federal authority vast areas of concern whose regulation has wisely been left by the Constitution to the States.