392 F.2d 120
 COMMONWEALTH OF PENNSYLVANIA, Attorney General of the Commonwealth of Pennsylvania, City of Philadelphia and Alan Levi Bond, by his mother, Mrs. Ruby Bond, Charles William Hicks and Theodore Lewis Hicks, by their mother, Mrs. Marie Hicks, James Scruggs and Henry Scruggs, by their mother, Mrs. Ardella Scruggs, Tyrone Karl White and Terry Sherwood White, by their mother, Mrs. Charlotte L. White, on behalf of themselves and all others similarly situated,
v.
Revelle W. BROWN et al., Trustees of the Estate of Stephen Girard, Appellants.
 No. 16721.
 United States Court of Appeals Third Circuit.
 Argued November 28, 1967.
 Decided March 7, 1968.
 Certiorari Denied May 20, 1968.
 
 See 88 S.Ct. 1811.
 Ernest R. von Starck, Morgan, Lewis & Bockius, Gaffney & Gaffney, Philadelphia, Pa. (Arthur Littleton, John Russell, Jr., Richard P. Brown, Jr., Philadelphia, Pa., on the brief), for appellants.
 William T. Coleman, Jr., Charles J. Biddle, Philadelphia, Pa. (Dilworth, Paxson, Kalish, Kohn & Levy, Robert W. Maris, Drinker, Biddle & Reath, J. Alan Kugle, Henry S. Hilles, Jr., Philadelphia, Pa., on the brief), for appelles other than the City of Philadelphia.
 Matthew W. Bullock, Jr., Second Deputy City Solicitor, Edward G. Bauer, Jr., City Solicitor on the brief, for appellee, City of Philadelphia.
 Before STALEY, Chief Judge, and McLAUGHLIN, KALODNER, SEITZ and VAN DUSEN, Circuit Judges.
 OPINION OF THE COURT
 GERALD McLAUGHLIN, Circuit Judge.
 
 
 1
 The problem here arises from the will of Stephen Girard, a Philadelphia, Pennsylvania resident who died in 1831. In his will, dated 1830, he laid lown his fundamental thesis that he had "been for a long time impressed with the importance of educating the poor, and of placing them by the early cultivation of their minds and the development of their moral principles, above the many temptations, to which, through poverty and ignorance they are exposed; * *." Continuing, he said "* * * I am particularly desirous to provide for such a number of poor male white orphan children, as can be trained in one institution, a better education as well as a more comfortable maintenance than they usually receive from the application of public funds." He coupled this with his statement of heartfelt interest in the welfare of Philadelphia and his desire to improve it in its Delaware River neighborhood for the benefit of the health of its citizens and so that the eastern part of the city would correspond better with the interior. So inter alia he left the valuable residue and remainder of his real and personal property to "The Mayor, Aldermen and citizens of Philadelphia, their successors and assigns in trust to and for the several uses intents and purposes hereinafter mentioned and declared * * *." The will went into considerable particulars regarding the Girard Philadelphia and Kentucky property. Concerning a personal estate bequest of two million dollars for the College the will outlined at length where it would be located and in great detail the exact construction of the College and outbuildings, etc. The will also gave five hundred thousand dollars to Philadelphia for various public improvements. The Commonwealth of Pennsylvania was bequeathed three hundred thousand dollars for internal improvement by canal navigation. This last bequest was conditioned upon the Commonwealth passing certain laws helpful to the testator's contemplated improvement of Philadelphia and for the desired objectives of Girard College. All the suggested assisting legislation was enacted by the Commonwealth in due course.
 
 
 2
 Mr. Girard stated specifically in his will:
 
 
 3
 "In relation to the organization of the college and its appendages, I leave, necessarily, many details to the Mayor, Aldermen and citizens of Philadelphia and their successors; and I do so, with the more confidence, as, from the nature of my bequests and the benefit to result from them, I trust that my fellow citizens of Philadelphia, will observe and evince especial care and anxiety in selecting members of their City Councils, and other agents * *."
 
 
 4
 He provided that the College accounts be kept separately so that they could be examined by a committee of the Pennsylvania legislature and that an account of same be rendered annually to said legislature together with a report of the state of the College. Philadelphia accepted the bequests and by ordinance set up a plan to administer the College by a Trusts Board. In 1833 a building committee of the City Council was appointed, a president of the College was chosen under an ordinance created for that purpose and the cornerstone of the main building laid. Construction was concluded in 1847 and the College opened the first of the following year. Down to 1869 the City Council operated the College directly, first by way of the trustees until 1851 when the latter offices were abolished, and the Council again took over direct management. In 1869 the Commonwealth enacted a law which gave Philadelphia a local Board of Trusts to take over the control of Girard College. From that date the Board of City Trusts remained in charge of the College until 1958. Broadly summing up the Commonwealth and City's intimate association with Girard College the District Court, with full justification in the record, found as fact that:
 
 
 5
 "Beginning in 1831 and continuing to date, the Commonwealth of Pennsylvania and the City of Philadelphia, by the enactment of statutes and ordinances, by the use and supervision of public officials, appointed by legislative and judicial bodies, by rendering services and providing tax exemptions, perpetual existence and exemption from tort liability have given aid, assistance, direction and involvement to the construction, maintenance, operation and policies of Girard College."
 
 
 6
 It is important to note in this sequence that Philadelphia has made a consistently brilliant showing through the years in its management of the funds and real property from the Girard estate for the College. The money bequest amounted to six million dollars. This was increased to ninety million dollars plus by 1959. The various estate properties given the City for the College were not allocated any book value by the estate. These have insurable value at this time of $42,000,000.
 
 
 7
 In 1954 two applicants requested admission to the College. They were fully qualified but were refused because they were Negroes. They brought their cause to the United States Supreme Court which held in that suit, titled Commonwealth of Pennsylvania et al. v. Board of Directors of City Trusts of City of Philadelphia, 353 U.S. 230, 231, 77 S.Ct. 806, 807, 1 L.Ed.2d 792 (1958):
 
 
 8
 "The Board which operates Girard College is an agency of the State of Pennsylvania. Therefore, even though the Board was acting as a trustee, its refusal to admit Foust and Felder to the college because they were Negroes was discrimination by the State. Such discrimination is forbidden by the Fourteenth Amendment. Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873. Accordingly, the judgment of the Supreme Court of Pennsylvania is reversed and the cause is remanded for further proceedings not inconsistent with this opinion."
 
 
 9
 The Supreme Court of Pennsylvania on remand took none of the plainly indicated proceedings called for by the United States Supreme Court. It simply remanded the litigation to the Orphans' Court of Philadelphia County.[1] That court, without notice or opportunity for the plaintiffs to do anything and with no request from the City or other source whatsoever, on its own initiative ousted Philadelphia as trustee and installed in place of the City Board, persons of its own choosing. There is disagreement between the parties with respect to the method used for the selection of the new trustees. But it is conceded by appellants regarding prior notification by the Orphans' Court to its choices that, "Certainly no court would appoint an individual to a position of such responsibility without first affording him an opportunity to refuse." The record does show clearly that one of the court trustees testified that he was telephoned by one of the Orphans' Court judges prior to the appointments order being filed and told that the court had appointed its own trustees of which he was one. It is also in the record that the new trustees, as stated by one of them, were sworn in by at least one of the Orphans' Court judges and that included in their oath was "* * * that we would undertake to manage the will of Stephen Girard in accordance with the way it was written." The said trustee, referring to that part of the oath, further mentioned "That is what we all assumed anyhow." We think the foregoing factual narrative demonstrates that the Orphans' Court of Philadelphia County has been substantially involved with the supervision of the Girard Estate.
 
 
 10
 The Philadelphia City Trustees took no appeal from their ouster. The children plaintiffs did. The Pennsylvania Supreme Court found that the Orphans' Court action was not inconsistent with the mandate of the United States Supreme Court or the Fourteenth Amendment or the Girard will. Application for certiorari was denied by the United States Supreme Court, 357 U.S. 570, 78 S.Ct. 1383, 2 L.Ed.2d 1546 (1958).
 
 
 11
 The present litigation was instituted in the United States District Court for the Eastern District of Pennsylvania. The trial judge originally passed solely upon the question of whether Girard College was within the jurisdiction of the Pennsylvania Public Accommodations Act of June 11, 1935, P.L. 297, as amended by the Act of June 24, 1939, P.L. 872. The Court held it was within Sections (a) and (c) of the Act and not within the proviso of Section (d). This Court reversed that finding and returned the suit to the District Court for trial on the merits of Count 1 of the complaint which charges that "The refusal of the trustees of Girard College to admit applicants without regard to race violates the Constitution of the United States of America and applicable Federal statutes."
 
 
 12
 Appellants argue that they have not violated the equal protection clause of the Fourteenth Amendment by denying admission to individuals because of their color. In support of this they cite some Pennsylvania decisions including the State Supreme Court Girard College opinion on the remand of the United States Supreme Court to that State Court "for further proceedings not inconsistent with this opinion." What the State Court did was turn the matter over to its Orphans' Court which eliminated the City as trustee and installed its own group, sworn to uphold the literal language of the Girard will, a move effectively continuing the very segregation which had been condemned by the United States Supreme Court. True, the latter had denied the application for certiorari. Times without number that Court has plainly ruled that there is no inference permissible from its denial of application for certiorari, favorable or unfavorable to either side of a litigation. Certainly in the whole muddy situation flowing from the State excision of the City Board, thereby taking away the linchpin of the Girard will, the then existing state litigation picture did not bring into the necessary sharp focus, the set piece maneuver which had completely circumvented the Supreme Court's directive. We, however, as above seen, do have all of that amazing effort to maintain Girard's discriminatory status before us in its true perspective.
 
 
 13
 Even in the above short résumé of the conception, creation and functioning of Girard College, the close, indispensable relationship between the College, the City of Philadelphia and the Commonwealth of Pennsylvania intended by Mr. Girard, meticulously set out in his will and faithfully followed for one hundred and twenty-seven years is self evident.[2] The ironic result of the removal of the City Trustees is that Pennsylvania's involvement with Girard College is far more powerful than was provided for by Mr. Girard. The Commonwealth's Orphans' Court, through its assumed power of appointment and reappointment of the Trustees, is significantly concerned with the current administration of the college.
 
 
 14
 On the whole vital Commonwealth and City relationship to Girard College shown we must agree with Judge Lord in the District Court, that the facts in Evans v. Newton, 382 U.S. 296, 301, 302, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966) are fairly comparable to those in this appeal and that the decision of the Supreme Court therein governs the issue before us. In Evans a tract of land was willed to the Mayor and City Council of Macon, Georgia, as a park for white people, to be controlled by a white Board of Managers. The city desegregated the park and the managers thereafter sued the city and the trustees of the residuary beneficiaries, asking for the city's removal as trustee and the appointment of private trustees to enforce the racial limitations of the will. The Court accepted the city's resignation and appointed three new trustees. The State Supreme Court upheld the terms of the will and the appointment of the new trustees. The United States Supreme Court reversed. Mr. Justice Douglas for the Court in the opinion said as to the park in issue:
 
 
 15
 "The momentum it acquired as a public facility is certainly not dissipated ipso facto by the appointment of `private' trustees. So far as this record shows, there has been no change in municipal maintenance and concern over this facility. Whether these public characteristics will in time be dissipated is wholly conjectural. If the municipality remains entwined in the management or control of the park, it remains subject to the restraints of the Fourteenth Amendment * * *.
 
 
 16
 * * * * * *
 
 
 17
 "Under the circumstances of this case, we cannot but conclude that the public character of this park requires that it be treated as a public institution subject to the command of the Fourteenth Amendment, regardless of who now has title under state law. We may fairly assume that had the Georgia courts been of the view that even in private hands the park may not be operated for the public on a segregated basis, the resignation would not have been approved and private trustees appointed. We put the matter that way because on this record we cannot say that the transfer of title per se disentangled the park from segregation under the municipal regime that long controlled it."
 
 
 18
 We think also that the Supreme Court's landmark decision in Shelley v. Kraemer, 334 U.S. 1, 20, 68 S.Ct. 836, 92 L.Ed. 1161 (1948) surely points to the affirmance of the instant judgment in accordance with the justice which must be done in this case. The state courts in Shelley had enforced restrictive real estate agreements. The Court by Chief Justice Vinson held:
 
 
 19
 "We hold that in granting judicial enforcement of the restrictive agreements in these cases, the States have denied petitioners the equal protection of the laws and that, therefore, the action of the state courts cannot stand. We have noted that freedom from discrimination by the States in the enjoyment of property rights was among the basic objectives sought to be effectuated by the framers of the Fourteenth Amendment. That such discrimination has occurred in these cases is clear. Because of the race or color of these petitioners they have been denied rights of ownership or occupancy enjoyed as a matter of course by other citizens of different race or color.
 
 
 20
 * * * * * *
 
 
 21
 "The historical context in which the Fourteenth Amendment became a part of the Constitution should not be forgotten. Whatever else the framers sought to achieve, it is clear that the matter of primary concern was the establishment of equality in the enjoyment of basic civil and political rights and the preservation of those rights from discriminatory action on the part of the States based on considerations of race or color."
 
 
 22
 See also Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953) and Sweet Briar Institute v. Button, 280 F.Supp. 312 (W.D.Va., 1967), rev'd per curiam, 387 U.S. 423, 87 S.Ct. 1710, 18 L.Ed.2d 865, decision on the merits, Civil No. 66-C-10-L (W.D.Va., filed July 14, 1967). In Sweet Briar the trustees of the Institute sought to enjoin enforcement by the state attorney general of a racial restriction contained in the will establishing and funding the college. On motion of the defendant, the three judge Court abstained until such time as the college carried its prior case through the state courts. The Supreme Court reversed, stressing strongly, Section 202 of the Civil Rights Act of 1964, 42 U.S.C. § 2000a-1 (1964), and ordered the District Court to determine the case on the merits. On remand, that Court entered a permanent injunction against enforcement of the racial restriction by the State of Virginia, holding that:
 
 
 23
 "The State cannot require compliance with the testamentary restriction because that would constitute State action barred by the Fourteenth Amendment. This was the express holding in the Girard Case."
 
 
 24
 280 F.Supp. 312 (W.D.Va., 1967).
 
 
 25
 Girard's definitive position in this period of more than ever being operated by an agency of the state does not simply emanate from the momentum of the Commonwealth and City legitimate participation in the establishment of Girard and its institutional life from its beginning to the present moment. It is in addition, as we hold, the obvious net consequence of the displacement of the City Board by the Commonwealth's agent and the filling of the Girard Trusteeships with persons selected by the Commonwealth and committed to upholding the letter of the will. Those radical changes pushed the College right back into its old and ugly unconstitutional position. Had the City Trustees been left undisturbed it is inconceivable that this bitter dispute before us would not have been long ago lawfully and justly terminated. It is inconceivable that those City Trustees would not have with goodwill opened the College to all qualified children. Given everything we know of Mr. Girard, it is inconceivable that in this changed world he would not be quietly happy that his cherished project had raised its sights with the times and joyfully recognized that all human beings are created equal.
 
 
 26
 We do not consider the move of the state court in disposing of the City Trustees and installing its own appointees to be a non obvious involvement of the State as mentioned in the test outlined in Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S. Ct. 856, 6 L.Ed.2d 45 (1961). The action in this instance and its motivation are to put it mildly, conspicuous. And what happened to Girard does "* * * significantly encourage and involve the State in private discriminations." Reitman v. Mulkey, 387 U.S. 369, 381, 87 S. Ct. 1627, 1634, 18 L.Ed.2d 830 (1967). As the Court there said by Mr. Justice White, "We have been presented with no persuasive considerations indicating that these judgments should be overturned."
 
 
 27
 The judgment of the District Court will be affirmed.
 
 
 
 Notes:
 
 
 [1]
 As rightly found by the District Court:
 "In 1959, after the decision of the United States Supreme Court in [Commonwealth of] Pennsylvania v. Board of Directors [etc.] 353 U.S. 230 [77 S.Ct. 806, 1 L.Ed.2d 792] (1957), the Legislature of Pennsylvania enacted a statute granting the Orphans' Court the power and the duty to appoint substitute trustees for the property of minors, when a previous trustee which was a political subdivision is removed `in the public interest,' and authorized a substitute trustee to invest such property of minors committed to their custody. The Act also contained other enabling legislation, without which the present defendants would be unable to carry out their duties. Act of November, 19, 1959, P.L. 1526 (Exh. P-51 (10)). The Legislature Journal of the Senate of the Commonwealth of Pennsylvania shows that this statute was passed specifically as enabling legislation in aid of Girard College (Exh. P-51 (10))."
 
 
 [2]
 So that there will be no possible cause for confusion, we note that the general topic of the sanctity of wills is not before us. Our total concern in this cause to which our decision is confined is a will in which the testator has deliberately and specially involved the State in the designated use of his testamentary property
 
 
 
 28
 KALODNER, Circuit Judge (concurring in the result).
 
 
 29
 I would affirm the Decree of the District Court on the ground that the removal in 1957 of the Board of Directors of City Trusts as trustee of the Stephen Girard Estate by the Orphans' Court, and its appointment of substituted individual trustees, for the avowed purpose of carrying out the racial exclusionary clause of Girard's Will, contravened the Fourteenth Amendment of the United States under the doctrine of Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948) and its progeny.[1]
 
 
 30
 The Fourteenth Amendment is contravened under the Shelley doctrine, where there is "active intervention of the state courts, supported by the full panoply of state power"[2] in the furtherance of enforcement of restrictions denying citizens their civil rights because of their race, color or creed.
 
 
 31
 In the instant case, the Orphans' Court had two alternative courses of action following the ruling of the Supreme Court of the United States in Commonwealth of Pennsylvania v. Board of Directors of City Trusts of City of Philadelphia, 353 U.S. 230, 77 S.Ct. 806, 1 L.Ed.2d 792 (1957), that the Board's denial of admission to Girard College of negro male orphans pursuant to the racial exclusionary clause of Stephen Girard's Will constituted state action in violation of the Fourteenth Amendment.
 
 
 32
 The Orphans' Court could have pursued the alternative of directing the Board of Directors of City Trusts to admit negro orphans to Girard College. Instead, it sua sponte pursued the alternative course of removing the Board and appointing individual private trustees in its stead so as to permit continuance of the discriminatory admission policy dictated by Girard's Will.[3]
 
 
 33
 That the alternative action taken by the Orphans' Court was for the avowed purpose of giving effect to the racial exclusionary clause of Girard's Will is explicitly spelled out in the Orphans' Court opinion accompanying its Decree of September 11, 1957 which removed the Board of Directors of City Trusts as trustee of the Girard Estate, "effective upon the appointment of a substituted trustee by this court."[4]
 
 
 34
 In this opinion, Girard's Estate, 7 Pa. Fiduc.Rep. 555, (1957), the Orphans' Court said at pages 557-558:
 
 
 35
 "The Supreme Court of the United States has ruled, as a matter of federal constitutional law, that the Board of Directors of City Trusts of the City of Philadelphia is an agency of the State of Pennsylvania and consequently forbidden by the Fourteenth Amendment from operating, even as a trustee of private funds, an establishment which excludes all but "poor white male orphans."
 
 
 36
 * * * * * *
 
 
 37
 "The Supreme Court of Pennsylvania, which is the final arbiter of our state law, has unequivocally stated that if for any reason, the Board of Directors of City Trusts of the City of Philadelphia cannot continue to administer the trust in accordance with testator's directions, it becomes the duty of this court to remove it as trustee and to appoint a substituted trustee which can lawfully administer the trust in the manner prescribed by the testator.
 
 
 38
 * * * * * *
 
 
 39
 "In order to harmonize the opinions of the United States Supreme Court and the Supreme Court of Pennsylvania, we hold: (1) that the primary purpose of the testator to benefit "poor white male orphans," only, must prevail; and (2) that the disqualification of the Board as trustee of this estate by the United States Supreme Court requires us to remove it from the administration of the trust and to appoint a substituted trustee, not so disqualified." (Emphasis supplied.)
 
 
 40
 The Supreme Court of the United States has recently ruled that in examining the constitutionality of a state act the reviewing court (1) must consider the act "in terms of its `immediate objective,' its `ultimate effect' and its `historical context and the conditions existing prior to its enactment'",[5] and, (2) must "assess the potential impact of official action in determining whether the State has significantly involved itself with invidious discriminations".[6]
 
 
 41
 The stated rule is, of course, applicable to the action of a state court.
 
 
 42
 Applying the principles above stated to the instant case, I am of the opinion that the Orphans' Court "significantly involved itself with invidious discriminations" when it removed the Board of Directors of City Trusts and appointed individual trustees of the Estate of Stephen Girard for the express purpose of effectuating the racial exclusionary clause in Girard's Will, and thereby brought itself within the ambit of the Shelley doctrine.
 
 
 43
 As the Shelley case said at page 18 of 334 U.S., at page 844 of 68 S.Ct.:
 
 
 44
 "* * * it has never been suggested that state court action is immunized from the operation of those provisions [14th Amendment] simply because the action is that of the judicial branch of the state government."
 
 
 45
 For the reasons stated I would confine the scope of our affirmance of the District Court's Decree to the ground assigned at the outset of this concurring opinion.
 
 
 
 Notes:
 
 
 [1]
 Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953)
 
 
 [2]
 Shelley v. Kraemer, 334 U.S. 1 at page 19, 68 S.Ct. 836, 845. At page 14 of 334 U.S., at page 842 of 68 S.Ct. ofShelley the Court said:
 "That the action of state courts and of judicial officers in their official capacities is to be regarded as action of the State within the meaning of the Fourteenth Amendment, is a proposition which has long been established by decisions of this Court. * * * In Ex parte Virginia (1880), 100 U.S. 339, 347, 25 L.Ed. 676, the Court observed: `A State acts by its legislative, its executive, or its judicial authorities. It can act in no other way.'"
 
 
 [3]
 The Orphans' Court in pursuing this alternative course acted in conformity with the holding of the Supreme Court of Pennsylvania, in Girard Will Case, 386 Pa. 548, 566, 127 A.2d 287 (1956) that should the Supreme Court of the United States hold, as it later did, that the Board of Directors of City Trusts could not carry out the exclusionary policy of Girard's Will, that the Orphans' Court could then appoint another trustee who could do so
 
 
 [4]
 The Orphans' Court Decree of October 4, 1957, substituting thirteen private citizens as Trustees of the Stephen Girard Estate, is reported at 7 Pa.Fiduc.Rep. 606
 
 
 [5]
 Reitman v. Mulkey (1967) 387 U.S. 369, at page 373, 87 S.Ct. 1627, at page 1630, 18 L.Ed.2d 830
 
 
 [6]
 Id. at page 380, 87 S.Ct. at page 1634
 
 
 VAN DUSEN, Circuit Judge (concurring):
 
 46
 I concur in the result reached by the majority opinion, but respectfully dissent from much of the language used.
 
 
 47
 Specifically, I disagree with the implication from the statements that the state courts in 1957 installed their own group of trustees "sworn to uphold the literal language of the Girard will" (and similar phrases). Such characterizations given to the actions of the Pennsylvania courts by the majority opinion seem to me unnecessary to the proper decision in this appeal. There is no necessary basis in this record to so criticize either the able Pennsylvania judges, who have so conscientiously handled the litigation arising from the Girard Trust, or the distinguished and dedicated trustees, who have contributed unselfishly so much to this important charitable enterprise, acting under the advice of their able counsel, for many years. This appeal is being decided on the basis of the present decisions of the United States Supreme Court in a field where the "federal role" is more "pervasive" and "intense" today than it was several years ago. United States v. Price, 383 U.S. 787, 806, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966). Recent decisions of the Supreme Court, particularly in light of forceful dissents by Mr. Justice Harlan, make clear that the Fourteenth Amendment does not now permit the discriminatory operation of a charity like Girard College if the operation of that discrimination receives support from certain types of "state action."
 
 
 48
 Of the forms or types of "state action" in aid of discrimination that the Supreme Court has held render the discrimination unconstitutional, that in Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), seems most clearly apposite to the facts of this case.
 
 
 49
 The decision of the United States Supreme Court in 1957 (353 U.S. 230, 77 S.Ct. 806, 1 L.Ed.2d 792) settled the question of whether the discrimination at Girard College was then unconstitutional state action. The same discrimination exists today and this appeal asks whether the unconstitutionality also remains because prohibited state action supports the discrimination. The answer is yes. When the Orphans' Court, on its own motion and without formal hearing, removed the Board of Directors of City Trusts and appointed "private" trustees in their place, such affirmative state action constituted the "encouragement" of discrimination held to violate the Fourteenth Amendment in Reitman v. Mulkey, supra, 387 U.S. at 376, 87 S. Ct. 1627. The state did not make itself merely neutral. Just as the California court did in Reitman v. Mulkey, this court can examine the constitutionality of such state action "in terms of its `immediate objective,' its `ultimate effect' and its `historical context and the conditions existing prior to its enactment,'" 387 U.S. at 373, 87 S.Ct. at 1630. Cf. Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). The record of the discrimination at Girard College after the 1957 United States Supreme Court decision makes it clear that the further "state actions" of the Pennsylvania courts did not "cure" the unconstitutionality, but perpetuated it by affirmatively encouraging continued discrimination. With hindsight it is clear that no reason exists for the deviation from Girard's will to appointing private trustees, except for its allowing compliance with the "white orphans" provision. And it is likewise an inescapable conclusion that the substitution of trustees in 1957 encouraged compliance with the "white" provision that has lasted for over 10 years. The state action that continues today in the Orphans' Court-trustee relationship is the "encouragement" of discrimination first given by the original appointment of the individual trustees.
 
 
 50
 Even clearer state action of "encouragement" is found in the statute passed by the Pennsylvania Legislature after the Supreme Court of Pennsylvania approved the substitution of private trustees. The Act of November 19, 1959, P.L. 1526, authorized ex post facto the Orphans' Courts' actions, and further implemented the change-over by fully empowering the new private trustees to serve in place of the Board of City Trusts as guardians of the boys attending Girard College and to set up a common trust fund for their property. The same Act also repealed several prior laws passed to aid Girard College. Such affirmative legislative action, as an attempt to render a state neutral with respect to otherwise unconstitutional discrimination, makes Reitman v. Mulkey still more apposite.
 
 
 51
 When Stephen Girard deliberately and pointedly chose to involve the State in the "private" charitable conduct of his school (as was decided at 353 U.S. 230, 77 S.Ct. 806), he ran the risk that Philadelphia might not accept the trust, or might be unable to administer it, or might be subsequently unable to act because the federal constitution was changed (as occurred when the Fourteenth Amendment was passed). It is in this unique situation of a testator's deliberate provision for a major role for the state in his charitable scheme, that the action of the state courts rises to the level of unconstitutional state action. The charitable scheme chosen by Girard might as easily have become invalid due to a change in the rule against perpetuities or some other limitation imposed by society on the unlimited rights of private property at death. See Commonwealth of Pennsylvania v. Brown, 260 F. Supp. 323, 357 (E.D.Pa.1966).