IN THE MATTER OF THE ESTATE OF KATHERINE FREY DICKERSON, DECEASED.

IN THE MATTER OF THE ESTATE OF CLARENCE GARRETSON, DECEASED.

Superior Court of New Jersey
Chancery Division Middlesex County

Decided November 18, 1983.

354

*Gregory B. Reilly,* and *Marion Percell,* appearing for plaintiff, Rutgers, the State University (*Lowenstein, Sandler, Brochin, Kohl, Fisher & Boylan,* attorneys).

*Thomas H. Dilts,* appearing for defendant, United Reformed Church (*Dilts, DeLancey & Welch,* attorneys).

*Irwin Kimmelman,* Attorney General, by *Mark I. Siman,* Deputy Attorney General.

*Philip L. Strong,* appearing for defendant, counter-claimant, New Brunswick Theological Seminary.

*Joseph Stevens,* appearing for amicus curiae, New Jersey Council of Churches (*Stevens & Stevens,* attorneys).

SKILLMAN, J.S.C.

The issue presented by these two cases, which were consolidated for trial, is whether a public institution of higher education may administer privately funded scholarship trusts which are restricted to students who intend to study for the Protestant Ministry.

The case involves two testamentary bequests to Rutgers University, one by Clarence Garretson, who died in 1938, and the other by Katherine Frey Dickerson, who died in 1946. The Garretson will provided for the creation of a "Clarence Garretson, Class of 1899 Scholarship" and specified, among other things, that in the award of the scholarship "special deference" should be extended to "one studying for the Christian Ministry." The Dickerson will provided that upon the death of Mrs. Dickerson's husband (which occurred in 1951) the unexpended principal of her residuary estate would be divided into three equal parts, one of which would be given to the New Brunswick Theological Seminary in trust for students "who are studying for the Protestant ministry," [1] the second to Rutgers in trust for students "who are taking a pre-divinity course and have expressed an intention to study for a Protestant Church ministry" and the third to Rutgers in trust for students of the "New Jersey State College for Women (a department of Rutgers

---

[1] The validity of the scholarship trust for students attending the New Brunswick Theological Seminary is not at issue in this case.

University) who are studying for service in Protestant Church social centre or other religious work." [2]

The scholarship trusts were administered in accordance with their terms for a substantial number of years. However, Rutgers suspended award of the scholarships in the late 1970s when its administrators developed misgivings over the restrictions to students who intend to study for the Protestant Ministry.

To determine the legality of such restrictions, Rutgers filed these actions.[3] It named as defendants the residuary legatees to whom the scholarship funds would revert in the event the trust provisions were held to be illegal or impossible of performance and not susceptible to modification under the doctrine of *cy pres*. Two of those defendants have entered appearances and actively participated in the litigation, the United Reformed Church of Somerville in Garretson and the New Brunswick Theological Seminary in Dickerson. In addition, the Attorney General has participated in his role as guardian of the public interest in charitable trusts (*see Trustees of Rutgers College in N.J. v. Richman*, 41 *N.J.Super.* 259, 283 (Ch.Div.1956)), and the New Jersey Council of Churches has participated in Dickerson as *amicus curiae*.

---

[2]Although there are some variations in their terms, all parties agree that the same legal issues are presented by each of the three trusts for Rutgers students established by the Garretson and Dickerson wills. Therefore, to simplify the discussion, the provisions of all three trusts are referred to generically in most parts of this opinion as being restricted to persons who intend to study for the Protestant Ministry.

[3]Rutgers also seeks deletion of the requirement of the Garretson trust that an applicant "shall pass the best entrance examination for admission in said University" because such an examination is no longer given and hence this condition cannot be justified. And it seeks removal of the Rutgers faculty from participation in the selection process since faculty involvement does not comport with current University practices. No party contests the impracticability of these features of the Garretson trust. Therefore, Rutgers' application for deletion of these provisions will be granted.

Rutgers has taken the position, supported by the Attorney General, that the trust provisions violate the Establishment Clause of the First Amendment to the United States Constitution as well as Article I, paragraph 5 of the New Jersey Constitution and the New Jersey Law Against Discrimination (*N.J.S.A.* 10:5-1 *et seq.*)[4] Defendants, United Reformed Church and New Brunswick Theological Seminary, joined by *amicus curiae* New Jersey Council of Churches, take the position that the trust provisions are valid.[5] In the alternative, they argue that if the trust provisions are invalid it is solely by virtue of Rutgers occupying the position of trustee and therefore Rutgers should be removed and a substitute trustee appointed. As a second alternative position, defendants argue that the principal of the trusts should revert to the residuary legatees which, under the Dickerson will, is defendant New Brunswick Theological Seminary and, under the Garretson will, includes defendant United Reformed Church.

The case was presented on stipulated facts supplemented by testimony from Arthur Richmond, the Director of Financial Aid at Rutgers, Alvin J. Popper, the Coordinator of Human Services for the Reformed Church of America and Frederick Mold, Jr., a vice president of the New Brunswick Theological Seminary.

---

[4]Rutgers has indicated that if the court concludes the restrictions contained in the Garretson and Dickerson trusts are legal it has no objection as a matter of university policy in continuing to administer the trusts in accordance with the wishes of the testators. *Compare Howard Savings Inst. v. Peep*, 34 *N.J.* 494 (1961).

[5]Defendant New Brunswick Theological Seminary has filed a counterclaim which seeks a declaration that the reference to "other religious work" in the Dickerson will is to Protestant religious work only and an injunction to thus restrict any future award. No party disputes that an overall reading of Mrs. Dickerson's will leads to the conclusion that this was her intent. However, the court is satisfied that Rutgers has administered this trust in good faith and that a declaratory judgment, without issuance of an injunction, will be sufficient to assure the future administration of the trust in accordance with Mrs. Dickerson's wishes.

All parties acknowledge that the issues presented are essentially legal and that only limited fact finding is required.

■■■■ The primary source of Rutgers' concern over the validity of the scholarship trusts is the Establishment Clause of the First Amendment. It is now clear that the "mandate that 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof' has been made wholly applicable to the States by the Fourteenth Amendment." *Abington School Dist. v. Schempp,* 374 *U.S.* 203, 215, 83 *S.Ct.* 1560, 1567, 10 *L.Ed.*2d 844 (1963). Furthermore, the constraints of the Religion Clauses are not limited to legislative enactments but extend to other forms of governmental activity as well. *See McCollum v. Bd. of Education,* 333 *U.S.* 203, 68 *S.Ct.* 461, 92 *L.Ed.* 649 (1948). But this does not mean that every governmental involvement with religion is unconstitutional. The Court in *Walz v. Tax Com'n,* 397 *U.S.* 664, 90 *S.Ct.* 1409, 25 *L.Ed.*2d 697 (1970) observed that:

> [R]igidity could well defeat the basic purpose of [the Religion Clauses], which is to insure that no religion be sponsored or favored, none commanded, and none inhibited. The general principle deducible from the First Amendment and all that has been said by the Court is this: that we will not tolerate either governmentally established religion or governmental interference with religion. Short of those expressly proscribed governmental acts there is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference. [397 *U.S.* at 669, 90 *S.Ct.* at 1411–12.]

The greatest number of Establishment Clause cases decided by the Supreme Court in recent years have involved public aid to non-public schools. *See, e.g., Wolman v. Walter,* 433 *U.S.* 229, 97 *S.Ct.* 2593, 53 *L.Ed.*2d 714 (1977); *Meek v. Pittenger,* 421 *U.S.* 349, 95 *S.Ct.* 1753, 44 *L.Ed.*2d 217 (1975); *Hunt v. McNair,* 413 *U.S.* 734, 93 *S.Ct.* 2868, 37 *L.Ed.*2d 923 (1973). Even in that context, the court has recognized that not every program which " 'in some manner aids an institution with a religious affiliation' violates the Establishment Clause." *Mueller v. Allen,* —— *U.S.* ——, 103 *S.Ct.* 3062, 3065, 77 *L.Ed.*2d 721 (1983), quoting *Hunt v. McNair, supra.* A second recurrent

area of litigation has involved attempts to include a religious element in public activities, most commonly the operation of the public schools. *See, e.g., Stone v. Graham,* 449 *U.S.* 39, 101 *S.Ct.* 192, 66 *L.Ed.*2d 199 (1980) (posting of Ten Commandments in public schools); *Abington School Dist. v. Schempp, supra* (Bible reading in public schools); *Engel v. Vitale,* 370 *U.S.* 421, 82 *S.Ct.* 1261, 8 *L.Ed.*2d 601 (1962) (prayer reading in public schools). In its most recent decision in this area, the court in *Marsh v. Chambers,* —— *U.S.* ——, 103 *S.Ct.* 3330, 77 *L.Ed.*2d 1019 (1983) upheld a practice of commencing legislative sessions with a religious invocation conducted by a minister paid out of public funds. It said that "[t]o invoke Divine guidance on a public body entrusted with making laws is not, in these circumstances, an 'establishment' of religion or a step toward establishment; it is simply a tolerable acknowledgment of beliefs widely held among the people of this country." —— *U.S.* at ——, 103 *S.Ct.* at 3336, 77 *L.Ed.*2d at 1028.

This case does not involve public aid to religious schools nor the conduct of a religious ceremony as part of a school program or other public proceeding. The scholarships are not paid from public funds raised through taxation; the sources are private funds voluntarily donated by individuals. The government did not decide to restrict the award of the scholarships to students with an intention of studying for the Protestant Ministry; that was the choice of the private donors. Furthermore, there is no suggestion that any course or other activity conducted at Rutgers is even influenced by the award of the scholarships. In short, the evils of "financial support" and "sponsorship of religious activity" implicated in cases involving public aid to non-public schools and religious invocations in schools or other public proceedings are not present here.

Rather, the issue is the extent to which government may accommodate the religious interests of private parties without being found to be actively involved in religious activity. Such a case implicates different interests and therefore requires a different analysis than a case involving government aid for or

sponsorship of religion. This difference was pointedly noted by Justice Douglas in *Zorach v. Clauson*, 343 *U.S.* 306, 72 *S.Ct.* 679, 96 *L.Ed.* 954 (1952). In upholding a New York City program which permitted public schools to release students during the school day so they could go to religious centers for religious instruction or devotional exercises, he said:

> When the state encourages religious instruction or cooperates with religious authorities by adjusting the schedule of public events to sectarian needs, it follows the best of our traditions. For it then respects the religious nature of our people and accommodates the public service to their spiritual needs.... Government may not finance religious groups nor undertake religious instruction nor blend secular and sectarian education nor use secular institutions to force one or some religion on any person. But we find no constitutional requirement which makes it necessary for government to be hostile to religion and to throw its weight against efforts to widen the effective scope of religious influence. [343 *U.S.* at 314, 72 *S.Ct.* at 684.]

The difference between government aid for or sponsorship of religion and government accommodation to private religious preferences is well illustrated by cases which have upheld the use of public premises for the conduct of religious services. *See, e.g., Widmar v. Vincent*, 454 *U.S.* 263, 270–275, 102 *S.Ct.* 269, 274–77, 70 *L.Ed.*2d 440 (1981) (invalidating state university regulation which prohibited the use of university buildings for religious teaching or worship); *O'Hair v. Andrus*, 613 *F.*2d 931 (D.C.Cir.1979) (sustaining issuance of permit for Pope to celebrate Mass on the National Mall); *Resnick v. E. Brunswick Tp. Bd. of Ed.*, 77 *N.J.* 88 (1978) (upholding school board policy of leasing school building for use during non-school hours for non-profit social, civic, recreational and charitable activities including the conduct of religious services). These cases point out that in determining whether there has been an Establishment Clause violation a court should look not at the admittedly religious goals of a religious organization in conducting its services but rather at the role of government in permitting a religious group to use its property. Thus, the court in *Resnick v. E. Brunswick Tp. Bd. of Ed., supra,* observed that

> [c]oncededly, the use of the public schools by sectarian groups has no secular purpose on their part. However, there was no sectarian purpose on the Board's part ... Thus, we discern no reason to prohibit the use of school facilities by religious groups. [77 *N.J.* at 118.]

Rutgers expresses concern that the restrictions contained in the Garretson and Dickerson wills are invalid because they fail to satisfy the three tests which the Supreme Court has devised to assist in determining whether the Establishment Clause has been violated. These tests are:

> First, the statute must have a secular legislative purpose ... Second, it must have a "primary effect" that neither advances nor inhibits religion ... Third, the statute and its administration must avoid excessive government entanglement with religion. *Meek v. Pittenger, supra,* 421 *U.S.* at 358, 95 *S.Ct.* at 1760 (Citations omitted).

However, these tests "must not be viewed as setting the precise limits to the necessary constitutional inquiry, but serve only as guidelines with which to identify instances in which the objectives of the Establishment Clause have been impaired." *Id.* at 359, 95 *S.Ct.* at 1760. See also *Mueller v. Allen, supra,* —— *U.S.* at ——, 103 *S.Ct.* at 3066, 77 *L.Ed.*2d at 727, which quotes with approval the characterization of the three part test in *Hunt v. McNair, supra,* 413 *U.S.* at 741, 93 *S.Ct.* at 2873, as a "helpful guidepost," and *Marsh v. Chambers, supra,* which decided a significant Establishment Clause issue without any reference to the three part test. In other words, these tests simply assist in answering the ultimate question, which is whether "sponsorship, financial support and active involvement of the sovereign in religious activity" has been demonstrated. *Meek v. Pittenger, supra,* 421 *U.S.* at 359, 95 *S.Ct.* at 1760; *Walz v. Tax Com'm., supra,* 397 *U.S.* at 668, 90 *S.Ct.* at 1411. In this case, it is manifest for the reasons already stated that Rutgers has not sponsored, financially supported, or become actively involved in religion in administering the Garretson and Dickerson trusts. Hence, it is arguable that, as in *Marsh v. Chambers, supra,* resort to the three part test is not needed. But even assuming that such an analysis is required, the scholarship trusts satisfy these tests.

As for the first part of the test, there is a secular purpose in providing scholarship funds to students including those who have a position in the Protestant Ministry as their career objective. To assist students in obtaining an education is a recognized secular purpose even when that education has a religious dimension to it. *See, e.g., Board of Education v. Allen,* 392 *U.S.* 236, 248, 88 *S.Ct.* 1923, 1929, 20 *L.Ed.*2d 1060, 1068 (1968). In any event, it is solely Rutgers' purpose that is relevant (*Resnick v. E. Brunswick Tp. Bd. of Ed., supra* ), and no party suggests that Rutgers has any purpose in administering scholarship funds other than to maximize the financial assistance available to its students.

The scholarship trusts also pass the second part of the test. The primary effect of Rutgers' administration of scholarships containing restrictive provisions, including those designed to encourage study for the Protestant Ministry, is not to advance religion but to assist students in the pursuit of a diverse range of educational programs and career objectives. The testimony at trial indicated that Rutgers administers around 800 scholarships with restrictive conditions. Many limit awards to students in a particular course of study or with a particular career objective. It has been Rutgers' policy to accept donations of scholarships containing such restrictions, perhaps due to concern that refusal to accept the restrictions would result in a total loss of scholarship funds. Therefore, the question is whether the Establishment Clause compels Rutgers to exclude scholarships designed to assist students studying for the Protestant Ministry from its general policy of accepting scholarship funds which are subject to a course of study or career restriction.

Thus posed, the question is similar to that raised by cases in which church groups have sought to conduct services on school or other public property. *Widmar v. Vincent, supra; O'Hair v. Andrus, supra; Resnick v. E. Brunswick Tp. Bd. of Ed., supra.* In those cases the courts have not asked whether

the primary effect of conducting a church service is to advance religion (an affirmative answer to this question would appear compelled), but rather whether a government policy of permitting church groups in common with other groups in the community to use public property has the primary effect of advancing religion. In answering this question in the negative, the Supreme Court has observed that "an open forum in a public university does not confer any imprimatur of State approval on religious sects or practices." *Widmar v. Vincent, supra,* 454 *U.S.* at 274, 102 *S.Ct.* at 276. The court has upheld the validity of property tax exemptions for churches (*Walz v. Tax Com'm., supra*) and income tax deductions for tuition payments to private schools (*Mueller v. Allen, supra*) based upon similar rationales. *See also* L. Tribe, *American Constitutional Law,* § 14–9, 839–846 (1978). To the same effect, Justice Brennan made the pertinent observation in his concurring opinion in *Walz* that "... each Church contributes to the pluralism of our society through its purely religious activities, but the state encourages these activities not because it champions religion *per se* but because it values religion among a variety of private non-profit enterprises that contribute to the diversity of the Nation." 397 *U.S.* at 693, 90 *S.Ct.* at 1424. Similarly, the continued administration by Rutgers of the Garretson and Dickerson scholarship trusts, along with other scholarships containing analogous non-sectarian restrictions, has the primary effect of promoting an educational program in which there can be participation by students with a wide variety of career objectives, including positions in the Protestant Ministry.

It is noteworthy that Rutgers provides other assistance to students who have the career objective of service in the Protestant Ministry. Tuition paid by students defrays less than half of their educational expenses, the remainder being paid out of state revenues. In this sense, every student attending Rutgers, including one studying for the Protestant Ministry, is subsidized directly out of tax funds. Yet no party argues that permitting students to attend Rutgers who intend to enter the

ministry has the primary effect of advancing religion. On the contrary, the exclusion of such students probably would be held to be governmental action hostile to religion. *Cf. Widmar v. Vincent, supra.* And if the direct subsidization out of public funds of students intending to enter the ministry does not have the primary effect of advancing religion, it is difficult to see how the supplementation of that aid by scholarships from privately donated funds has that effect.

Rutgers provides assistance in yet another way to students intending to perform Protestant Ministry work. Testimony at trial indicated that there is cross registration of students between Rutgers and the New Brunswick Theological Seminary. Helping to educate divinity students could be viewed as a more direct form of aid to religion than the undergraduate education of students intending to attend divinity school in the future, but Rutgers properly views such cross registration, like the release program upheld in *Zorach v. Clauson, supra,* as an accommodation to religious education rather than its promotion by government.

The final aspect of the three part test applicable in Establishment Clause cases is whether the administration of the trusts involves excessive governmental entanglement with religion. Rutgers financial aid administrators formerly identified students with an interest in studying for the Protestant Ministry through the university chaplain. While there is no longer a chaplain, defendants suggest that the intention of a student to enter the ministry can be easily determined by a declaration of the student confirmed by communication with the church to which he belongs. Mr. Popper testified that the Reformed Church of America has a formal procedure for identifying any student with an intention of studying for the ministry and that many other denominations have similar procedures. When a student is an adherent of a faith with such a procedure, it is no more administratively entangling for Rutgers to confirm a student's intention to study for the ministry with his

church than it is for a public school to confirm attendahce for religious instruction with a pupil's church, which was part of the release program sustained in *Zorach v. Clauson, supra*. When a student is not a member of a church with such a procedure, nothing precludes Rutgers from simply accepting a student's declaration of an intention to enter the ministry. Certainly, the court should not read the Garretson and Dickerson wills as imposing administrative obligations upon Rutgers which might be excessively entangling when the essential objectives of the testators can be accomplished through use of the straightforward procedures suggested by defendants.[6]

Rutgers expresses concern that, even if its administration of scholarships for students with an intention of performing religious work were otherwise unobjectionable, the restrictions to students with an intention of studying for the "Christian" or "Protestant" Ministry are inconsistent with "[t]he clearest command of the Establishment Clause," which is "that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 *U.S.* 228, 244, 102 *S.Ct.* 1673, 1683, 72 *L.Ed.*2d 33 (1982).[7] However, Rutgers has not extended any preference for one religious sect over another. There is no suggestion that Rutgers has refused to accept scholarship funds designed to assist students studying for religious work in a non-Protestant or non-Christian denomination. It was solely the testators, Mr. Garretson and Mrs. Dickerson, who quite understandably desired to encourage

---

[6]In cases involving government aid to sectarian education, the Court has recognized that the excessive entanglement test includes not only the danger of administrative entanglement with religion but also potential political divisiveness in legislative deliberations over appropriations. *Lemon v. Kurtzman*, 403 *U.S.* 602, 622–624, 91 *S.Ct.* 2105, 2115–16, 29 *L.Ed.*2d 745. (1971). Since state funds are not involved here, the political divisiveness aspect of the excessive entanglement test is not implicated.

[7]Although not relied on by Rutgers, Article I, paragraph 4 of the New Jersey Constitution contains a similar prohibition: "[t]here shall be no establishment of one religious sect in preference to another, ..."

study preparatory to performing religious work in their own faiths. Assuming there are students of other faiths at Rutgers with an interest in doing religious work and an absence of private scholarship funds available to them (no evidence was presented on either point), the prohibition against government extending a preference to one religion over another is not violated solely because one religion may be in a better position than another to benefit from a government accommodation to private religious preferences. Thus, the Court in *Zorach v. Clauson, supra,* did not ask whether all religions were able to take advantage of the release time program, and in *Widmar v. Vincent, supra, O'Hair v. Andrus, supra* and *Resnick v. E. Brunswick Tp. Bd. of Ed., supra,* the courts were not concerned with whether all religions were able to use public premises for their services. The neutrality requirement of the Establishment Clause was satisfied by the equal availability of the government accommodation to private religious instruction or services although in actuality some denominations might be more likely to benefit than others. *Cf. Thomas v. Indiana Employment Sec. Div.,* 450 *U.S.* 707, 101 *S.Ct.* 1425, 67 *L.Ed.* 2d 624 (1981) (extension of unemployment compensation benefits to a member of Jehovah's Witnesses who refuses to perform work on military armaments does not violate Establishment Clause). By the same token, Rutgers avoids any preference of one religion over another or of non-religion over religion by its willingness to administer a wide range of private scholarship trusts which further the diverse interests and objectives of all its students.[8]

---

[8]Since it has been concluded that the administration by Rutgers of the Garretson and Dickerson scholarship trusts does not violate the Establishment Clause, it is unnecessary to consider what the effect would be of removing Rutgers as trustee if a constitutional violation had been found. However, it may be observed in passing that the cases cited by Rutgers on this issue all involved attempts to remedy Equal Protection Clause violations by the removal of public trustees. *See, e.g., Evans v. Newton,* 382 *U.S.* 296, 86 *S.Ct.* 486, 15 *L.Ed.*2d 373 (1966); *Commonwealth of Pennsylvania v. Brown,* 392 *F.*2d 120

██ Rutgers also has a concern that the trusts violate state statutes and constitutional provisions guaranteeing civil rights. It points to the Law Against Discrimination, which prohibits an "owner" of a "place of public accommodation" from discriminating against any person on the basis of "creed" in providing any of the "accommodations, advantages, facilities or privilege thereof" (*N.J.S.A.* 10:5–12(f); *see also N.J.S.A.* 10:5–4) and defines "a place of public accommodation" as including any "college or university." *N.J.S.A.* 10:5–5(*l*). Rutgers also points to Article I, paragraph 5 of the New Jersey Constitution, which provides in pertinent part that "[n]o person shall be denied the enjoyment of any civil ... right, because of religious principles." [9]

The short answer to this concern is that the restrictions upon the award of the scholarships may not fairly be viewed as discriminating on the basis of "creed" or "religious principles." It is true that persons studying for the Protestant Ministry

---

(3rd Cir.1968) *cert.* den. 391 *U.S.* 921, 88 *S.Ct.* 1811, 20 *L.Ed.*2d 657 (1968); *In re Crichfield Trust,* 177 *N.J.Super.* 258 (Ch.Div.1980). The interests sought to be protected by the Equal Protection Clause of the Fourteenth Amendment and the Religion Clauses of the First Amendment are fundamentally different. As observed in *Norwood v. Harrison,* 413 *U.S.* 455, 470–471, 93 *S.Ct.* 2804, 2813, 37 *L.Ed.* 723 (1973), "[t]he Constitution ... places no value on discrimination as it does on the values inherent in the Free Exercise Clause." Accordingly, the nature and extent of the connection between government and religion is pertinent to an Establishment Clause claim and a governmental involvement with religion which is found to violate the Establishment Clause may be remedied if that involvement is made more attenuated. Compare *McCollum v. Bd. of Education, supra* with *Zorach v. Clauson, supra.* It follows that if Rutgers' involvement in the administration of the trusts gave rise to an Establishment Clause problem its removal as trustee could eliminate the problem.

[9] If the Dickerson and Garretson scholarship trusts were violative of the New Jersey Constitution and/or the Law Against Discrimination, any similar scholarship trusts for students attending private non-sectarian colleges and universities also would be invalid because the prohibitions of these provisions, unlike those of the First Amendment, are applicable to private institutions. *Peper v. Princeton University Bd. of Trustees,* 77 *N.J.* 55, 67–68, 76–80 (1978).

presumably will be Protestants and in this sense persons who are not Protestants are excluded from eligibility for the scholarship funds. However, Protestants not studying for the ministry, who are the great majority of Protestants attending Rutgers, also are excluded from eligibility. Therefore, the essence of the restrictions upon award of the scholarships is not to discriminate on the basis of "creed" or "religious principles" but rather to promote pursuit of a particular vocation by offering a special benefit to students who intend to study for that purpose. Thus viewed, these scholarships are essentially the same as numerous other restrictive scholarship trusts administered by Rutgers and other universities, which specify that eligibility is limited to students majoring in a particular field, such as humanistic studies, African studies or law, and which no one contends are invidiously exclusionary.

Recent decisions construing constitutional and statutory provisions designed to protect civil rights have recognized that even government programs which draw distinctions based upon race will not automatically be found discriminatory. Rather, it is the obligation of the court to determine whether a particular classification is invidious or serves a legitimate non-discriminatory purpose. Thus, in *University of California Regents v. Bakke*, 438 *U.S.* 265, 98 *S.Ct.* 2733, 57 *L.Ed.*2d 750 (1978), the court held that a state university may take race into consideration in its admissions program in order to obtain a diversified student body, without violating Title VI of the Federal Civil Rights Act or the Equal Protection Clause of the Fourteenth Amendment. Similarly, in *United Bldg. & Const. Trades Council v. Camden*, 88 *N.J.* 317, 334–337 (1982) *prob. juris. noted*, — *U.S.* —, 103 *S.Ct.* 1270, 75 *L.Ed.*2d 492 (1983), the court held that minority hiring goals, designed to eradicate the effects of past discrimination, do not violate Article I, paragraph 5 of the New Jersey Constitution. *See also United Steelworkers of America, CIO–CLC v. Weber*, 443 *U.S.* 193, 99 *S.Ct.* 2721, 61 *L.Ed.*2d 480 (1979).

▓▓▓▓▓▓ There are non-invidious, legitimate purposes of comparable importance served by the restrictions in the Garretson and Dickerson scholarship trusts. Persons have a constitutionally protected right to follow the precepts of their own religions. *Sherbert v. Verner*, 374 *U.S.* 398, 83 *S.Ct.* 1790, 10 *L.Ed.*2d 965 (1963). Studying for the ministry or encouraging others to do so are closely related objectives of a legitimate and non-invidious nature. Therefore, this court is unable to find that the Garretson and Dickerson trusts violate either the Law Against Discrimination or the New Jersey Constitution.

▓▓▓▓▓ Lastly, Rutgers suggests that the restrictions in the Garretson and Dickerson trusts should be deleted because students who are studying for the Protestant Ministry are difficult to identify and hence adherence to these restrictions has become "impossible" or "impractical." See 2 Scott, *The Law of Trusts* (3 ed. 1967) §§ 165–166, at 1261–68 (noting that a trustee is not under a duty to comply with a term of the trust if compliance is impossible or illegal). Alternatively, it suggests that those restrictions are "obsolete, inappropriate or impractical" and hence should be deleted pursuant to *N.J.S.A.* 15:18–21(b). However, the testimony at trial demonstrated that students interested in studying for the Protestant Ministry can be easily identified. As noted earlier, churches maintain lists of students studying for the ministry and are willing to share that information with Rutgers. In addition, these scholarships can be listed in university brochures, together with the approximately 800 other restrictive scholarships administered by Rutgers, and students who qualify can be expected to identify themselves. Therefore, it cannot be said that the restrictions upon award of the scholarships are "impossible," "impractical," "obsolete" or "inappropriate."

For these reasons, the court is satisfied that the provisions of the Garretson and Dickerson scholarship trusts which limit or

extend preferences to students studying for the Christian or Protestant Ministry are valid and capable of being enforced and declaratory judgments upholding the validity of the trusts will be entered.